1  Fred W. Schwinn (SBN 225575)
   CONSUMER LAW CENTER, INC.
2  12 South First Street, Suite 1014
   San Jose, California 95113-2418
3  Telephone Number: (408) 296-6100
   Facsimile Number: (408) 294-6100
4  Email Address: fred.schwinn@sjconsumerlaw.com

5  Attorney for Plaintiff
   RUSSELL DON HOLTZ
6

7

8

9              UNITED STATES DISTRICT COURT
10      FOR THE NORTHERN DISTRICT OF CALIFORNIA
                   SAN JOSE DIVISION
11  RUSSELL DON HOLTZ,

12                           Plaintiff,        COMPLAINT FOR DAMAGES
                                               AND DECLARATORY RELIEF
13        v.
                                               JURY TRIAL DEMANDED
14  BANK OF AMERICA, NATIONAL
    ASSOCIATION, a national banking
15  association; CAL-WESTERN
    RECONVEYANCE CORPORATION, a
16  California corporation; PRLAP, INC., a
    North Carolina corporation; and DOES 1
17  through 20, inclusive,

18                           Defendants.

19

20                        INTRODUCTION

21      1.    Plaintiff institutes this action to enforce his right to rescind two (2) consumer credit

22  transactions, to void Defendants' security interest in Plaintiff's home and to recover actual damages,

23  statutory damages, attorney fees, and the costs of this action against Defendants for multiple violations

24  of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, ("TILA"), and Federal Reserve Board Regulation

25

26  Z, 12 C.F.R. § 226, promulgated pursuant thereto.

27  / / /

28

Case No. C08 02166

Filed
APR 2 5 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

ADR

E-FILING

## JURISDICTION

2.    Jurisdiction is conferred upon this Court pursuant to 15 U.S.C. § 1640(e) and 28 U.S.C. §§ 1331 and 1337 in that the claims alleged herein arise under the laws of the United States.

3.    The Court has jurisdiction over Plaintiff's action for declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. § 2203 and Rule 65 of the Federal Rules of Civil Procedure.

4.    This action arises out of Defendants' violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA").

## VENUE

5.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Venue is also proper in this judicial district in that Defendants transact business in this judicial district and the violations of the TILA complained of occurred in this judicial district.

## INTRADISTRICT ASSIGNMENT

6.    This lawsuit should be assigned to the San Jose Division of this Court because a substantial part of the events or omissions which gave rise to this lawsuit occurred in San Benito County.

## PARTIES

7.    Plaintiff, RUSSELL DON HOLTZ (hereinafter "Plaintiff"), owns his home and has resided at 905 Suiter Street, Hollister, California for the past 6 years.  Plaintiff is a natural person and a "consumer" within the meaning of 15 U.S.C. § 1602(h) and Regulation Z § 226.2(a)(11).

8.    Defendant, BANK OF AMERICA, NATIONAL ASSOCIATION (hereinafter "BANK OF AMERICA"), is a national banking association engaged in the business of consumer

mortgage lending in this state with its principal place of business located at: 101 South Tryon Street, Charlotte, North Carolina 28255. BANK OF AMERICA may be served as follows: Bank of America, National Association, c/o CT Corporation System, 818 West Seventh Street, Los Angeles, California 90017. At all relevant times alleged in this Complaint BANK OF AMERICA regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed. BANK OF AMERICA is a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

9.    Defendant, CAL-WESTERN RECONVEYANCE CORPORATION ("CAL-WESTERN"), is a California corporation engaged in the residential mortgage business in this state with its principal place of business located at:  525 East Mail Street, El Cajon, California 92022. CAL-WESTERN may be served as follows:  Cal-Western Reconveyance Corporation, c/o Margaret Padilla, Agent for Service for Service of Process, 525 East Main Street, El Cajon, California 92022. Plaintiff is informed, believes and thereon alleges, that CAL-WESTERN has no beneficial or financial interest in the subject Deed of Trust, but holds legal title as Trustee for other Defendants named in this action. CAL-WESTERN has been named in this action solely for the purpose of clearing title to the subject property. See Cal. Civil Code § 2924(b).

10.    Defendant, PRLAP, INC. ("PRLAP"), is a North Carolina corporation engaged in the residential mortgage business in this state with its principal place of business located at:  101 South Tryon Street, Charlotte, North Carolina 28255. PRLAP may be served as follows:  PRLAP, Inc., c/o CT Corporation System, 818 West Seventh Street, Los Angeles, California  90017. Plaintiff is informed, believes and thereon alleges, that PRLAP is an instrumentality of BANK OF AMERICA. PRLAP has been named in this action solely for the purpose of clearing title to the subject property.

11.    The true names and capacities, whether individual, corporate, associate or

otherwise, of Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff at this time, and Plaintiff therefore sues said Defendants by such fictitious names. Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, Defendants DOES 1 through 10, inclusive, are natural persons, limited liability companies, corporations or business entities of unknown form that have or are doing business in the state of California. Plaintiff will seek leave of the Court to replace the fictitious names of these Doe Defendants with their true names when they are discovered by Plaintiff.

12.    Plaintiff is informed, believes and thereon alleges, that DOES 11 through 20, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are assignees to the predatory loans which are the subject of this action. Plaintiff will seek leave of the Court to replace the fictitious names of these entities with their true names when they are discovered by Plaintiff.

13.    At all relevant times alleged in this Complaint, Defendants, and each of them, were engaged in the business of promoting, marketing, distributing and selling the loans that are the subject of this Complaint, throughout the state of California, including San Benito County.

14.    Plaintiff is informed, believes and thereon alleges, that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiff's injuries, as herein alleged, were proximately caused by the conduct of Defendants.

15.    Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, each of the Defendants sued herein were the agent, servant, employer, joint venturer,

partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and were at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.

16.    Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

17.    Whenever reference is made in this Complaint to any act of any corporate or other business Defendant, that reference shall mean that the corporation or other business did the acts alleged in this Complaint through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

18.    At all relevant times alleged in this Complaint, each Defendant has committed the acts, caused others to commit the acts, ratified the commission of the acts, or permitted others to commit the acts alleged in this Complaint and has made, caused, ratified, or permitted others to make, the untrue or misleading statements alleged in this Complaint.  Whenever reference is made in this Complaint to any act of Defendants, such allegation shall mean that each Defendant acted individually and jointly with the other Defendants.  The term "Defendants" wherever used in this Complaint shall mean all named defendants.

## FACTUAL ALLEGATIONS

19.    Plaintiff purchased the property located at 905 Suiter Street, Hollister, California (hereinafter "the home") in 2002.

20.    At all relevant times alleged in this Complaint, Plaintiff has resided in the home.

The Senior Loan

21.    On or about November 2, 2004, Plaintiff entered into a consumer credit transaction with BANK OF AMERICA in which the extended consumer credit was subject to a finance charge and which was initially payable to BANK OF AMERICA.

22.    A true and accurate unsigned copy of the Note evidencing the senior loan transaction (hereinafter the "Senior loan") is attached hereto, marked Exhibit "A", and by this reference is incorporated herein.

23.    Plaintiff is informed, believes and thereon alleges, that beneficial interest in the Note (Exhibit "A") was thereafter sold, assigned or otherwise transferred to one or more of the DOE Defendants.

24.    The Senior loan transaction was a "consumer credit" transaction as that term is defined in the TILA, 15 U.S.C. § 1602(h) and Regulation Z § 226.2(a).

25.    The Senior loan transaction was a "closed-end credit" transaction as the term is defined in Regulation Z § 226.2(10) and is subject to the requirements for such transactions set forth in 15 U.S.C. § 1638 and Regulation Z §§ 226.17 – 226.24.

26.    As part of the Senior loan transaction, BANK OF AMERICA obtained a security interest in the form of a Deed of Trust in the property commonly known as 905 Suiter Street, Hollister, California  95023 which is used as Plaintiff's principal dwelling.

27.    Said Deed of Trust is recorded in the office of the San Benito County Recorder and can be found as document numbered 2004-0020275.

28.    A true and accurate copy of the Deed of Trust evidencing the senior security interest is attached hereto, marked Exhibit "B", and by this reference is incorporated herein.

29.    A true and correct copy of the <u>Federal Truth-in-Lending Disclosure Statement</u> given by BANK OF AMERICA to Plaintiff for the senior loan transaction is attached hereto, marked Exhibit "C", and by this reference is incorporated herein.

30.    A true and correct copy of the <u>Notice of Right to Cancel</u> disclosures given by BANK OF AMERICA to Plaintiff for the senior loan transaction are attached hereto, marked Exhibit "D", and by this reference is incorporated herein.

31.    BANK OF AMERICA provided copies of Exhibits "C" and "D" to Plaintiff on or about November 2, 2004.

32.    On or about February 14, 2008, Defendants filed a <u>Notice of Default</u> in the office of the San Benito County Recorder which can be found as document number 2008-0001408.

33.    A true and accurate copy of the <u>Notice of Default</u> is attached hereto, marked Exhibit "E", and by this reference is incorporated herein.

34.    On or about March 21, 2008, Plaintiff, through his attorney, notified BANK OF AMERICA that Plaintiff had exercised his right to rescind the Senior loan transaction pursuant to the TILA and Regulation Z.

35.    A true and accurate copy of the letter by which Plaintiff informed BANK OF AMERICA that he had exercised his rescission rights in the Senior loan transaction is attached hereto, marked Exhibit "F" and by this reference is incorporated herein.

36.    BANK OF AMERICA received the letter by which Plaintiff informed it that he had exercised his rescission rights in the Senior loan transaction on or about March 24, 2008.  A true and accurate copy of the Certified Mail Return Receipts are attached hereto, marked Exhibit "G" and by this reference are incorporated herein.

37.    More than 20 calendar days have passed since BANK OF AMERICA received

1    notice of Plaintiff's intent to rescind the Senior loan transaction.

2    38.    BANK OF AMERICA has failed, refused and neglected to take any action

3    necessary or appropriate to reflect the termination of any security interest created under the Senior loan

4

5    transaction, including the security interest described in Paragraphs 26-28, as required by 15 U.S.C. §

6    1635(b) and Regulation Z § 226.23(d)(2).

7    39.    BANK OF AMERICA has failed to return to Plaintiff any money or property

8    given by Plaintiff to anyone in connection with the Senior loan transaction, as required by 15 U.S.C. §

9    1635(b) and Regulation Z § 226.23(d)(2).

10                                   The Junior Loan

11    40.    On or about June 14, 2007, Plaintiff entered into a consumer credit transaction

12    with BANK OF AMERICA in which the extended consumer credit was subject to a finance charge and

13

14    which was initially payable to BANK OF AMERICA.

15    41.    A true and accurate unsigned copy of the Bank of America Equity Maximizer

16    Agreement and Disclosure Statement evidencing the transaction (hereinafter the "Junior loan") is

17

18    attached hereto, marked Exhibit "H", and by this reference is incorporated herein.

19    42.    Plaintiff is informed, believes and thereon alleges, that beneficial interest in the

20    Bank of America Equity Maximizer Agreement and Disclosure Statement (Exhibit "H") was thereafter

21    sold, assigned or otherwise transferred to one or more of the DOE Defendants.

22    43.    The Junior loan transaction was a "consumer credit" transaction as that term is

23

24    defined in the TILA, 15 U.S.C. § 1602(h) and Regulation Z § 226.2(a).

25    44.    The Junior loan transaction was an "open-end credit plan" as the term is defined in

26    the TILA, 15 U.S.C. § 1602(i) and Regulation Z § 226.2(20) and is subject to the requirements for such

27    transactions set forth in 15 U.S.C. § 1637a and Regulation Z §§ 226.5b – 226.16.

28

45.    As part of the Junior loan transaction, BANK OF AMERICA obtained a security interest in the form of a Deed of Trust in the property commonly known as 905 Suiter Street, Hollister, California  95023 which is used as Plaintiff's principal dwelling.

46.    Said Deed of Trust is recorded in the office of the San Benito County Recorder and can be found as document numbered 2007-0009154.

47.    A true and accurate copy of the Short Form Deed of Trust evidencing the Junior security interest is attached hereto, marked Exhibit "I", and by this reference is incorporated herein.

48.    A true and correct copy of the Notice of Right to Cancel disclosures given by BANK OF AMERICA to Plaintiff for the Junior loan transaction are attached hereto, marked Exhibit "J", and by this reference is incorporated herein.

49.    BANK OF AMERICA provided copies of Exhibit "J" to Plaintiff on or about June 14, 2007.

50.    The proceeds from the Junior loan transaction refinanced a previous "open-end credit plan" between BANK OF AMERICA and Plaintiff dated July 14, 2005.  The Deed of Trust for the refinanced "open-end credit plan" is recorded in the office of the San Benito County Recorder and can be found as document numbered 2005-0015214.

51.    On or about March 21, 2008, Plaintiff, through his attorney, notified BANK OF AMERICA that Plaintiff had exercised his right to rescind the Junior loan transaction pursuant to the TILA and Regulation Z.

52.    A true and accurate copy of the letter by which Plaintiff informed BANK OF AMERICA that he had exercised his rescission rights in the Junior loan transaction is attached hereto, marked Exhibit "K" and by this reference is incorporated herein.

53.    BANK OF AMERICA received the letter by which Plaintiff informed it that he

had exercised his rescission rights in the Junior loan transaction on or about March 24, 2008. A true and accurate copy of the Certified Mail Return Receipts are attached hereto, marked Exhibit "L" and by this reference are incorporated herein.

54.    More than 20 calendar days have passed since BANK OF AMERICA received notice of Plaintiff's intent to rescind the Junior loan transaction.

55.    On or about April 14, 2008, BANK OF AMERICA sent a letter to Plaintiff's counsel wherein BANK OF AMERICA stated that "Bank of America finds that the referenced loan is not voidable."

56.    A true and accurate copy of the letter by which BANK OF AMERICA informed Plaintiff that it refused to honor Plaintiff's rescission of the Junior loan transaction is attached hereto, marked Exhibit "M" and by this reference is incorporated herein.

57.    BANK OF AMERICA has failed, refused and neglected to take any action necessary or appropriate to reflect the termination of any security interest created under the Junior loan transaction, including the security interest described in Paragraphs 45-47, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.15(d)(2).

58.    BANK OF AMERICA has failed to return to Plaintiff any money or property given by Plaintiff to anyone in connection with the Junior loan transaction, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.15(d)(2).

## CLAIMS

### FIRST CLAIM FOR RELIEF

**Violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and
Federal Reserve Board Regulation Z, 12 C.F.R. § 226 et seq.
(Senior Loan)**

59.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth

herein.

60.    At all relevant times alleged in this Complaint, BANK OF AMERICA was a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

61.    Plaintiff's transaction with BANK OF AMERICA was a "consumer" "credit" transaction within the meaning of the TILA, 15 U.S.C. §§ 1602(h) and 1602(e) and Regulation Z §§ 226.2(a)(11) and 226.2(a)(14).

62.    The Senior loan was secured by Plaintiff's principal "dwelling" within the meaning of the TILA, 15 U.S.C. § 1602(v) and Regulation Z § 226.2(a)(19).

63.    The Senior loan was and is subject to Plaintiff's right of rescission as described by 15 U.S.C. § 1635 and Regulation Z § 226.23.

64.    Any beneficial interest in the Senior loan transaction held by Defendant, DOES 11-20, is subject to Plaintiff's rescission claim pursuant to 15 U.S.C. § 1641(c).

65.    In connection with the Senior loan transaction, BANK OF AMERICA failed to timely deliver to Plaintiff two copies of the notice of the right to rescind which clearly and conspicuously disclosed the date the rescission period expired, as required by 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b)(1)(v).

66.    Because Defendants initiated a non-judicial foreclosure process on the primary dwelling of Plaintiff, the provisions of 15 U.S.C. § 1635(i) and Regulation Z § 226.23(h) apply in this action.

67.    Plaintiff had a continuing right to rescind the Senior loan transaction until the third business day after receiving both the right of rescission notice described in paragraph 30 and all "material" disclosures described in paragraph 29, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3).

68.    By reason of BANK OF AMERICA's failure to provide required disclosures, Plaintiff retained a right to rescind the Senior loan transaction upon the initiation of any non-judicial foreclosure process.

69.    Plaintiff properly exercised his right to rescind the Senior loan.

70.    As a result of BANK OF AMERICA's violations of the TILA and Regulation Z, Plaintiff is entitled to a determination that any security interest held by BANK OF AMERICA in his principal dwelling as a result of the Senior loan transaction is void, pursuant to 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(1).

71.    As a result of BANK OF AMERICA's violations of the TILA and Regulation Z, Plaintiff is entitled to an award of all monies paid to BANK OF AMERICA, or anyone else in connection with the Senior loan transaction, including, but not limited to, all closing costs and prepaid interest, and all interest and principal payments, pursuant to 15 U.S.C. §§ 1635(b) and 1640(a)(1) and Regulation Z § 226.23(d)(1)-(2).

72.    As a result of BANK OF AMERICA's violations of the TILA and Regulation Z, Plaintiff is entitled to an award of $2,000.00 in recoupment for BANK OF AMERICA's disclosure violations of the TILA and Regulation Z, pursuant to 15 U.S.C. § 1640(a)(2)(A).

73.    As a result of BANK OF AMERICA's violations of the TILA and Regulation Z, Plaintiff is entitled to an award of $2,000.00 in affirmative damages for BANK OF AMERICA's failure to rescind the Senior loan transaction in conformity with the TILA and Regulation Z, pursuant to 15 U.S.C. § 1640(a)(2)(A).

74.    As a result of BANK OF AMERICA's violation of the TILA and Regulation Z, Plaintiff is entitled to an award of his reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1640(a)(3).

## SECOND CLAIM FOR RELIEF

### Violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and Federal Reserve Board Regulation Z, 12 C.F.R. § 226 et seq.
### (Junior Loan)

75.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

76.    At all relevant times alleged in this Complaint, BANK OF AMERICA was a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

77.    Plaintiff's transaction with BANK OF AMERICA was a "consumer" "credit" transaction within the meaning of the TILA, 15 U.S.C. §§ 1602(h) and 1602(e) and Regulation Z §§ 226.2(a)(11) and 226.2(a)(14).

78.    The Junior loan transaction was secured by Plaintiff's principal "dwelling" within the meaning of the TILA, 15 U.S.C. § 1602(v) and Regulation Z § 226.2(a)(19).

79.    The Junior loan transaction was and is subject to Plaintiff's right of rescission as described by 15 U.S.C. § 1635 and Regulation Z § 226.15.

80.    Any beneficial interest in the Junior loan transaction held by Defendant, DOES 11-20, is subject to Plaintiff's rescission claim pursuant to 15 U.S.C. § 1641(c).

81.    In connection with the Junior loan transaction, BANK OF AMERICA failed to timely deliver to Plaintiff two copies of the notice of the right to rescind using the appropriate model form or substantially similar notice, as required by 15 U.S.C. § 1635(a) and Regulation Z § 226.15(b).

82.    Plaintiff had a continuing right to rescind the Junior loan transaction until the third business day after receiving the right of rescission notice described in paragraph 81, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.15(a)(3).

83.    By reason of BANK OF AMERICA's failure to provide required disclosures,

Plaintiff retained a right to rescind the Junior loan transaction until three years from the date of the transaction.

84.    Plaintiff properly exercised his right to rescind the Junior loan transaction in a timely fashion.

85.    As a result of BANK OF AMERICA's violations of the TILA and Regulation Z, Plaintiff is entitled to a determination that any security interest held by BANK OF AMERICA in his principal dwelling as a result of the Junior loan transaction is void, pursuant to 15 U.S.C. § 1635(b) and Regulation Z § 226.15(d)(1).

86.    As a result of BANK OF AMERICA's violations of the TILA and Regulation Z, Plaintiff is entitled to an award of all monies paid to BANK OF AMERICA, or anyone else in connection with the Junior loan transaction, including, but not limited to, all closing costs, prepaid interest, and all interest and principal payments, pursuant to 15 U.S.C. §§ 1635(b) and 1640(a)(1) and Regulation Z § 226.15(d)(1)-(2).

87.    As a result of BANK OF AMERICA's violations of the TILA and Regulation Z, Plaintiff is entitled to an award of $2,000.00 in affirmative damages for BANK OF AMERICA's disclosure violations of the TILA and Regulation Z, pursuant to 15 U.S.C. § 1640(a)(2)(A).

88.    As a result of BANK OF AMERICA's violations of the TILA and Regulation Z, Plaintiff is entitled to an award of $2,000.00 in affirmative damages for BANK OF AMERICA's failure to rescind the transaction in conformity with the TILA and Regulation Z, pursuant to 15 U.S.C. § 1640(a)(2)(A).

89.    As a result of BANK OF AMERICA's violation of the TILA and Regulation Z, Plaintiff is entitled to an award of his reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1640(a)(3).

## REQUEST FOR RELIEF

Plaintiff requests that this Court:

1.  Assume jurisdiction in this proceeding;

2.  Declare that:

    a.  The provisions of 15 U.S.C § 1635(i) and Regulation Z, 12 C.F.R. § 226.23(h) apply in this action;

    b.  BANK OF AMERICA violated the TILA, 15 U.S.C. §§ 1635(a) and 1635(b) and Regulation Z, 12 C.F.R. §§ 226.15(b) and 226.23(b)(1)(v);

    c.  Plaintiff validly rescinded the Senior loan transaction, pursuant to the TILA, 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d);

    d.  Plaintiff validly rescinded the Junior loan transaction, pursuant to the TILA, 15 U.S.C. § 1635(b) and Regulation Z § 226.15(d);

    e.  Any security interest held by Defendants on Plaintiffs' property is void and unenforceable, pursuant to the TILA, 15 U.S.C. § 1635(b) and Regulation Z §§ 226.15(d)(1) and 226.23(d)(1);

3.  Award Plaintiff:

    a.  $2,000.00 in statutory damages for BANK OF AMERICA's failure to honor Plaintiffs' valid rescission of the Senior loan transaction, pursuant to the TILA, 15 U.S.C. § 1640(a)(2)(A)(iii);

    b.  $2,000.00 in statutory damages for BANK OF AMERICA's failure to honor Plaintiffs' valid rescission of the Junior loan transaction, pursuant to the TILA, 15 U.S.C. § 1640(a)(2)(A)(iii);

    c.  $2,000.00 in statutory damages in recoupment for BANK OF

AMERICA's disclosure violations in the Senior loan transaction, pursuant to the TILA, 15 U.S.C. § 1640(a)(2)(A)(iii);

d.    $2,000.00 in statutory damages for BANK OF AMERICA's disclosure violations in the Junior loan transaction, pursuant to the TILA, 15 U.S.C. § 1640(a)(2)(A)(iii);

4.    Order that Defendants return to Plaintiff all money paid to anyone in connection with the Senior loan transaction, pursuant to the TILA, 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2);

5.    Order that Defendants return to Plaintiff all money paid to anyone in connection with the Junior loan transaction, pursuant to the TILA, 15 U.S.C. § 1635(b) and Regulation Z § 226.15(d)(2);

6.    Award Plaintiff the costs of this action and reasonable attorneys fees pursuant to 15 U.S.C. § 1640(a)(3); and

7.    Award Plaintiff such other and further relief as may be just and proper.

CONSUMER LAW CENTER, INC.

By: /s/ Fred W. Schwinn
Fred W. Schwinn (SBN 225575)
CONSUMER LAW CENTER, INC.
12 South First Street, Suite 1014
San Jose, California 95113-2418
Telephone Number: (408) 294-6100
Facsimile Number: (408) 294-6190
Email Address: fred.schwinn@sjconsumerlaw.com

Attorney for Plaintiff
RUSSELL DON HOLTZ

## CERTIFICATION PURSUANT TO CIVIL L.R. 3-16

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

/s/ Fred W. Schwinn
Fred W. Schwinn, Esq.

## DEMAND FOR JURY TRIAL

PLEASE TAKE NOTICE that Plaintiff, RUSSELL DON HOLTZ, hereby demands a trial by jury of all triable issues of fact in the above-captioned case.

/s/ Fred W. Schwinn
Fred W. Schwinn, Esq.

# Exhibit "A"

LOAN NUMBER: 6384765183

# NOTE

11/01/04                    HOLLISTER                                    CA
[Date]                      [City]                                       [State]
905 SUITER STREET, HOLLISTER, CA 95023

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    265,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is    BANK OF AMERICA, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    5.750    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1ST    day of each month beginning on JANUARY 01, 2005. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    DECEMBER 01, 2034    I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    BANK OF AMERICA, P.O. BOX 9000, GETZVILLE, NY 14068-9000    or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $    1,546.47    .

## 4. BORROWER'S RIGHT TO PREPAY

I HAVE THE RIGHT TO MAKE PAYMENTS OF PRINCIPAL AT ANY TIME BEFORE THEY ARE DUE. A PAYMENT OF PRINCIPAL ONLY IS KNOWN AS A "PREPAYMENT." WHEN I MAKE A PREPAYMENT, I WILL TELL THE NOTE HOLDER IN WRITING THAT I AM DOING SO. I MAY NOT DESIGNATE A PAYMENT AS A PREPAYMENT IF I HAVE NOT MADE ALL THE MONTHLY PAYMENTS DUE UNDER THIS NOTE.

I MAY MAKE A FULL PREPAYMENT OR PARTIAL PREPAYMENT WITHOUT PAYING ANY PREPAYMENT CHARGE. AFTER PAYING ANY LATE FEES OR OUTSTANDING FEES THAT I OWE, THE NOTE HOLDER WILL USE MY PREPAYMENTS TO REDUCE THE AMOUNT OF PRINCIPAL THAT I OWE UNDER THIS NOTE. HOWEVER, THE NOTE HOLDER MAY APPLY MY PREPAYMENT TO THE ACCRUED AND UNPAID INTEREST ON THE PREPAYMENT AMOUNT BEFORE APPLYING MY PREPAYMENT TO REDUCE THE PRINCIPAL AMOUNT OF THIS NOTE. IF I MAKE A PARTIAL PREPAYMENT, THERE WILL BE NO CHANGES IN THE DUE DATES OR IN THE AMOUNT OF MY MONTHLY PAYMENT UNLESS THE NOTE HOLDER AGREES IN WRITING TO THOSE CHANGES.



## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.0                % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

BS5N (0101)

BS5R 11/01/04 10:56 AM 6384765183

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_____ (Seal)
RUSSELL D. HOLTZ                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower
                                              *(Sign Original Only)*

# Exhibit "B"

Record at the Request of:
**San Benito Land Title Corporation**
**1645636   SA**

Recording Requested By:
BANK OF AMERICA

Return To:
LOAN # 6384765183
FL9-700-01-01
JACKSONVILLE POST CLOSING
BANK OF AMERICA
9000 SOUTHSIDE BLVD.
BLDG 700, FILE RECEIPT DEPT.
JACKSONVILLE, FL 32256

**2004-0020275**

| Recorded | REC FEE | 52.00 |
| Official Records | | |
| County Of | | |
| SAN BENITO | | |
| JOHN R. HODGES | | |
| Recorder | | |

09:00AM 09-Nov-2004 | pl
Page 1 of 16

[Space Above This Line For Recording Data]

# DEED OF TRUST     LOAN #6384765183

## DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined
in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this
document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated     NOVEMBER 01, 2004     ,
together with all Riders to this document.
**(B) "Borrower"** is RUSSELL D. HOLTZ

Borrower's address is     905 SUITER ST, HOLLISTER, CA  95023

. Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is BANK OF AMERICA, N.A.

Lender is a  NATIONAL BANKING ASSOCIATION
organized and existing under the laws of   THE UNITED STATES OF AMERICA

**CALIFORNIA** – Single Family

Page 1 of 15

BS6(CA)   (0207)            VMP Mortgage Solutions (800)521-7291
                CVCA 11/01/04 10:56 AM 6384765183

This is a true and correct copy of the
records in this office.
ATTEST Date:  **MAR 1 3 2008**
Joe Paul Gonzalez, County Clerk in and
for the County of San Benito,
State of California.
BY:
                              Deputy

Lender's address is 10850 WHITE ROCK RD, 1ST FLOOR, RANCHO CORDOVA, CA
956700000
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is  PRLAP, INC.

(E) "Note" means the promissory note signed by Borrower and dated  NOVEMBER 01, 2004  .
The Note states that Borrower owes Lender TWO HUNDRED SIXTY FIVE THOUSAND AND
00/100                                                                                                                  Dollars
(U.S. $      265,000.00      ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  DECEMBER 01, 2034  .
(F) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower (check box as applicable):

☐ Adjustable Rate Rider     ☐ Condominium Rider               ☐ Second Home Rider
☐ Balloon Rider             ☐ Planned Unit Development Rider   ☐ Other(s) [specify]
☐ 1-4 Family Rider          ☐ Biweekly Payment Rider

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the  COUNTY                          of  SAN BENITO                                    :

          [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

"LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF."

Parcel ID Number: 055-060-025                which currently has the address of
905 SUITER STREET                              [Street]
HOLLISTER               [City] , California 95023    [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

**BS6(CA)** (0207)              Page 3 of 15
    CVCA 11/01/04 10:56 AM 6384785183

4

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

5

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

6

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

7

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

9

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

*10*

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

*II*

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

*12*

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

13

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.



Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____                                    _____(Seal)
                                                                   RUSSELL D. HOLTZ                    -Borrower

_____

_____                                    _____(Seal)
                                                                                                      -Borrower

_____(Seal)                                      _____(Seal)
                    -Borrower                                                                          -Borrower

_____(Seal)                                      _____(Seal)
                    -Borrower                                                                          -Borrower

_____(Seal)                                      _____(Seal)
                    -Borrower                                                                          -Borrower

15

**State of California**
**County of    San Benito**                              } ss.

On  November 2, 2004              before me,    Sue Azzarello
                                                        personally appeared

Russell D. Holtz


personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.
WITNESS my hand and official seal.                    _Sue Azzarello_      (Seal)



16b

Title Order Number:

File Number:     3501-1645636

**Exhibit "A"**

Real property in the City of Hollister, County of San Benito, State of California, described as follows:

BEGINNING AT AN IRON PIPE AT THE INTERSECTION OF THE EASTERLY LINE OF SUITER STREET, AS CONVEYED TO THE CITY OF HOLLISTER BY DEED FROM CLEMENT B. WILSON, ET AL, DATED JANUARY 2, 1953 AND RECORDED IN VOL. 193 OF OFFICIAL RECORDS, AT PAGE 563, WITH THE NORTHERLY LINE OF LAND CONVEYED TO NICHOLAS HAWKINS BY DEED FROM T.S. HAWKINS DATED OCTOBER 9, 1874 AND RECORDED IN VOL. 1 OF DEEDS, AT PAGE 315; SAID POINT OF BEGINNING BEING NORTH 88 DEG. 27' 30" WEST 240.00 FEET FROM THE INTERSECTION OF SAID NORTHERLY LINE WITH THE WESTERLY LINE OF WEST STREET; THENCE ALONG SAID NORTHERLY LINE SOUTH 88 DEG. 27' 30" EAST 100.00 FEET TO AN IRON PIPE AT THE SOUTHWESTERLY CORNER OF LAND CONVEYED TO C.N. HAWKINS, ET AL TRUSTEES, BY DEED FROM L.S. WOODS AND WIFE, DATED JULY 17, 1891 AND RECORDED IN VOL. 17 OF DEEDS, AT PAGE 214; THENCE ALONG THE WESTERLY LINE OF SAID LAND AND THE PROJECTION THEREOF NORTH 1 DEG. 28' EAST 63.32 FEET TO AN IRON PIPE (AT 45.00 FEET ON THIS COURSE IS AN IRON PIPE AT THE NORTHWESTERLY CORNER OF SAID LAND SO CONVEYED TO C.N. HAWKINS, ET AL, TRUSTEES); THENCE NORTH 88 DEG. 27' 30" WEST 100.00 FEET TO AN IRON PIPE IN THE EASTERLY LINE OF SUITER STREET AS DESCRIBED IN DEED TO CITY OF HOLLISTER ABOVE REFERRED TO; THENCE ALONG SAID EASTERLY LINE SOUTH 1 DEG. 28' WEST 63.32 FEET TO THE POINT OF BEGINNING.

APN: 055-060-025-0

# Exhibit "C"

**FEDERAL TRUTH IN LENDING**
**DISCLOSURE STATEMENT**
**Real Estate Loans**

Loan Center    RANCHO CORDOVA WHOLESALE                No.    2660    Loan No.    6384765183

Principal Amount of Proposed Loan _____ 265,000.00 _____          Expected Funding Date _____ 11/08/04

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 6.797  % | $ 294,060.46 | $ 262,668.75 | $ 556,729.20 |

1.  **Payment Schedule.**
    Your payment schedule will be:

| Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** | Number of Payments | Payments Are Due MONTHLY Beginning | Amount of Payments ** |
|---|---|---|---|---|---|
| 360 | 01/01/05 | 1546.47 | | | |

2.  **Security and Property Insurance.**
    You are giving a security interest in real estate at:
    905 SUITER STREET, HOLLISTER, CA 95023
    You may obtain property insurance from anyone you want who is acceptable to the Lender.

3.  **Late Payment.**
    If a payment is not received by the Lender by its first banking day which is at least ___15___ days after the payment due date, you will be charged _____ 5.0 _____ % of the payment.

4.  **Prepayment.**
    If you pay off early, you [X] will not [ ] may have to pay a prepayment penalty.
    [ ] If you prepay your loan on other than the regular installment date, you may be assessed interest charges until the end of the month.
    [ ] You may be entitled to a refund of the mortgage insurance premium from HUD.
    You [X] will not [ ] may be entitled to a refund of part of the finance charge.

[X] 5.  **Assumption Policy.**
    [X] Someone buying your home cannot assume the remainder of your loan on its original terms.
    [ ] Someone buying your home may be allowed to assume the remainder of your loan on its original terms, subject to certain conditions stated in your loan documents.

[ ] 6.  **Variable Rate.**
    Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.
[ ] 7.  **Required Deposit.**
    The annual percentage rate does not take into account your required deposit.

8.  See your loan documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

9.  **Certain Security Interest Charges.** PLEASE SEE THE GOOD FAITH ESTIMATE AND HUD-1 FOR THESE FEES.
    Recording/filing          $ _____          $ _____
    Lien release recording/filing  $ _____          $ _____

10. The loan applied for will not be secured by any contractual lien except that resulting from the mortgage or deed of trust trust covering the security described in the Security and Property Insurance Section.

**The payment amount does not include a tax and insurance reserve.

BANK OF AMERICA, N.A. ("LENDER")

RUSSELL D. HOLTZ                                                          DATE

_____          _____ DATE

_____          _____ DATE

_____          _____ DATE

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable) over the life of the loan.

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable) over the life of the loan. These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

Initials:_____

# Exhibit "D"

# NOTICE OF RIGHT TO CANCEL

LENDER: BANK OF AMERICA, N.A.

BORROWERS/OWNERS RUSSELL D. HOLTZ

DATE  11/01/04
LOAN NO.  6384765183
TYPE

ADDRESS       905 SUITER STREET
CITY/STATE/ZIP  HOLLISTER, CA 95023
PROPERTY

You are entering into a transaction that will result in a mortgage on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1)    The date of the transaction, which is _____ ; or
(2)    The date you received your Truth in Lending disclosures; or
(3)    The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

CA3-701-01-79, WHOLESALE FUNDING, BANK OF AMERICA, N.A.
10850 WHITE ROCK RD, 1ST FLOOR
RANCHO CORDOVA, CA  956700000

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of _____ _____ (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

## I WISH TO CANCEL

_____        _____
SIGNATURE                                         DATE

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement.

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective as to all borrowers/owners.

_____        _____
BORROWER/OWNER RUSSELL D. HOLTZ                   DATE

_____        _____
BORROWER/OWNER                                    DATE

_____        _____
BORROWER/OWNER                                    DATE

_____        _____
BORROWER/OWNER                                    DATE

LN-BS64 (9802)        ELECTRONIC LASER FORMS, INC. - (800)327-0545        11/96

C064 11/01/04 10:56 AM 6384765183

# NOTICE OF RIGHT TO CANCEL

|  | DATE | 11/01/04 |
|---|---|---|
| LENDER: BANK OF AMERICA, N.A. | LOAN NO. | 6384765183 |
|  | TYPE |  |

BORROWERS/OWNERS RUSSELL D. HOLTZ

ADDRESS          905 SUITER STREET
CITY/STATE/ZIP   HOLLISTER, CA 95023
PROPERTY

You are entering into a transaction that will result in a mortgage on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1)   The date of the transaction, which is _____ ; or
(2)   The date you received your Truth in Lending disclosures; or
(3)   The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

## HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

CA3-701-01-79, WHOLESALE FUNDING, BANK OF AMERICA, N.A.
10850 WHITE ROCK RD, 1ST FLOOR
RANCHO CORDOVA, CA  956700000

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of _____ _____ (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

## I WISH TO CANCEL

_____          _____
SIGNATURE                                                  DATE

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement.

Each borrower/owner in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective as to all borrowers/owners.

_____          _____
BORROWER/OWNER RUSSELL D. HOLTZ                             DATE

_____          _____
BORROWER/OWNER                                             DATE

_____          _____
BORROWER/OWNER                                             DATE

_____          _____
BORROWER/OWNER                                             DATE

C064 11/01/04 10:56 AM 6384765183

# Exhibit "E"

Recording Requested By
When Recorded Mail To

Cal-Western Reconveyance Corp.
P.O. Box 22004
525 East Main Street
El Cajon  CA  92022-9004

2008-0001408

| Recorded | REC FEE | 11.00 |
| Official Records | | |
| County of | | |
| San Benito | | |
| JOE PAUL GONZALEZ | | |
| Clerk-Recorder | | |
| | SW | |
| 11:15AM 14-Feb-2008 | Page 1 of 2 | |

Trustee Sale No. 1135929-03

Loan No. XXXXXX5183 Ref: HOLTZ, RUSSELL D

Space Above This Line For Recorder's Use

# NOTICE OF DEFAULT

## IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice). This amount is $6,426.34 as of February 13, 2008, and will increase until your account becomes current.  While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

BANK OF AMERICA, N.A.

C/O Cal-Western Reconveyance Corporation
P.O. Box 22004
525 East Main Street
El Cajon  CA  92022-9004
(619)590-9200

This is a true and correct copy of the records in this office. MAR 1 3 2008
ATTEST Date: _____
Joe Paul Gonzalez, County Clerk in and for the County of San Benito, State of California.

BY: _____
        Deputy

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.

*2E*

Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.  Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

---

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**NOTICE IS HEREBY GIVEN:**

**CAL-WESTERN RECONVEYANCE CORPORATION is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary**

under a deed of trust dated November 01, 2004 executed by

**RUSSELL D. HOLTZ**
       as trustor, to secure certain obligations in favor of

**BANK OF AMERICA, N.A.**
       as beneficiary

recorded as document 2004-0020275 on November 09, 2004 in book XX page XX official records in the office of County Recorder of SAN BENITO
County, California, describing land therein as:

**COMPLETELY DESCRIBED IN SAID DEED OF TRUST**

said obligations including a promissory note for the principal sum of $265,000.00
that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

**Failure to pay the monthly payment due November 1, 2007 of principal, interest and impounds and subsequent installments due thereafter; plus late charges; together with all subsequent sums advanced by beneficiary pursuant to the terms and conditions of said deed of trust.**

**That by reason thereof the present beneficiary under such Deed of Trust has deposited with said trustee such Deed of Trust and all documents evidencing obligations secured thereby and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.**

T.S. 1135929-03

| Dated: | February 13, 2008 | CAL-WESTERN RECONVEYANCE CORPORATION |
|---|---|---|

Signature By _Deborah G Bird_

# Exhibit "F"

# CONSUMER LAW CENTER, INC.

Fred W. Schwinn
fred.schwinn@sjconsumerlaw.com

12 South First Street, Suite 1014
San Jose, CA  95113-2418

(408) 294-6100
Fax (408) 294-6190

March 21, 2008

Bank of America, N.A.
c/o CT Corporation System, Agent for Service
818 West Seventh Street
Los Angeles, CA  90017-3407

**CERTIFIED MAIL**
**7007 0710 0001 0498 6967**

Bank of America, N.A.
9000 Southside Boulevard, Bldg. 700
Jacksonville, FL  32256-0790

**CERTIFIED MAIL**
**7007 0710 0000 0498 6974**

Bank of America, N.A.
10850 White Rock Road, 1st Floor
Rancho Cordova, CA  95670-6044

**CERTIFIED MAIL**
**7007 0710 0001 0498 6981**

Bank of America, N.A.
Loss Mitigation
P.O. Box 9000
Getzville, NY  14068-9904

**CERTIFIED MAIL**
**7007 0710 0001 0498 6998**

Cal-Western Reconveyance Corporation
c/o Margaret Padilla, Agent for Service
525 East Main Street
El Cajon, CA  92020-4007

**CERTIFIED MAIL**
**7007 0710 0001 0498 7001**

Cal-Western Reconveyance Corporation
P.O. Box 22004
El Cajon, CA  92022-9004

**CERTIFIED MAIL**
**7007 0710 0001 0498 7018**

Re:   Russell Don Holtz
      905 Suiter Street
      Hollister, California  95023
      Loan No. 6384765183

Dear Sir/Madam:

This office represents Russell Don Holtz concerning the above referenced loan transaction which he entered into with Bank of America, N.A., on or about November 1, 2004. We have been authorized by our client to rescind this transaction and hereby exercise that right pursuant to the Federal Truth in Lending Act (TILA), 15 U.S.C. § 1635(i)(1)(B) and Regulation Z, 12 C.F.R. § 226.23(h)(1)(ii).

- 1 -

Bank of America, N.A., failed the provide the TILA disclosures to our client or the TILA disclosures provided to our client failed to meet the requirements of the Federal Truth in Lending Act and Regulation Z in the following respects:

     (a)   Our client was not provided the disclosures that are required by the Federal Truth in Lending Act, 15 U.S.C. § 1635(a) and Regulation Z, 12 C.F.R. § 226.23(b)(1)(v), in that our client was not provided with two properly completed copies of the Notice of Right to Cancel disclosure in a credit transaction in which a security interest was retained or acquired in our client's principal dwelling.

As a result of these violations of the Truth in Lending Act and Regulation Z, the security interest held by Bank of America, N.A., is void upon our client's rescission. See 15 U.S.C. § 1635 and 12 C.F.R. § 226.23. Pursuant to the TILA and Regulation Z, you have twenty days after receipt of this notice of rescission to return to our client all monies paid and to take action necessary or appropriate to reflect termination of the security interest on our client's principal dwelling.

Please be advised that if you do not cancel the security interest and return all consideration paid by our client you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

Very Truly Yours,

Fred W. Schwinn

cc:    Russell Don Holtz



# Exhibit "G"

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Rudy Rivera_  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  _Rudy Rivera_   C. Date of Delivery  _3-24-08_

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

BANK OF AMERICA, NA
c/o CT Corp. Sys, agent of service
818 West Seventh St
Los Angeles, CA.
90017-3407

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 6967

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

MAR 24 2008

1. Article Addressed to:

Bank of America, NA
9000 Southside Blvd
Bldg. 700
Jacksonville, Fl.
32256-0790

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 6974

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

Bank of America, NA
10850 White Rock Rd.
1st fl.
Rancho Cordova, CA
95670-6044

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 6981

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _K. A. Geary_    ☐ Agent   ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

MAR 24 2008

1. Article Addressed to:

Bank of America, NA
Loss Mitigation
P.O. Box 9000
Getzville, NY
   14068-9904

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 6998

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _T. Swinford_    ☐ Agent   ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
T. Swinford   MAR 25 2008

1. Article Addressed to:

Cal-Western Reconveyance
   Corp
C/o M. Padilla, Agent for
   service
525 East Main St.
El Cajon, CA 92022-
   9007

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 7001

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _T. Swinford_    ☐ Agent   ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
T. Swinford

1. Article Addressed to:

Cal-Western Reconveyance
   Corp.
P.O. Box 22004
El Cajon, CA
   92022-9004

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 7018

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

# Exhibit "H"

# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT
# AND DISCLOSURE STATEMENT

**Property Serving as Security (the "Property"):** 905 SUITER ST, HOLLISTER, SAN BENITO, CALIFORNIA 95023-4631
**Borrower's Name and Address:** RUSSELL D HOLTZ, 905 SUITER, HOLLISTER, CALIFORNIA 95023

**Lender's Name and Address:** Bank of America, NA, National Banking Association, 100 North Tryon Street, Charlotte, North Carolina 28255

| | | |
|---|---|---|
| **Date:** JUNE 14, 2007 | **Annual Percentage Rate:** 8.2400 | **Draw Period:** 120 Mos. |
| **Loan Number:** 68249017102999 | **Margin:** -.0100 | **Repayment Period:** 180 Mos. |
| **Maturity Date:** JUNE 14, 2032 | **Max. Interest Rate:** 24.0000 | **Billing Cycle:** MONTHLY |
| **Credit Limit:** $ 75,000.00 | | |

1. **Introduction.** This Bank of America Equity Maximizer Agreement and Disclosure Statement ("Agreement") governs your Home Equity Line of Credit Account (your "Credit Line" or "Account") with the lender named above ("Lender"). Your Account is a revolving credit arrangement in which we make loans to you by advancing funds ("Advances") at your direction, allowing you to repay those Advances and take additional Advances, subject to the terms of this Agreement. This Agreement will remain in full force and effect notwithstanding that the Account Balance under the Agreement may occasionally be reduced to an amount equal to or less than zero.

In this Agreement, the terms "we," "us," "our" and "Bank" refer to the Lender or to any subsequent assignee or transferee. Except as noted below, the terms "you," "your," "yours" and "Borrower" refer to each person that signs this Agreement or has authority to use the Credit Line. Read this Agreement carefully so that you know how your Account works and keep a copy of this Agreement for your records.

2. **Borrower's Promise to Pay.** You promise to pay to Lender the total of all Advances plus **FINANCE CHARGES**, together with all fees and charges under the terms of this Agreement. You will pay your Account according to the terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

3. **Term.** The term of your Account will begin as of the date of this Agreement ("Opening Date") and will continue until all indebtedness under this Agreement, if not already paid pursuant to the payment provision below, will be due and payable upon maturity. The Draw Period of your Account will begin on the date after the Opening Date, when this Agreement is accepted by us in the State of North Carolina, following the perfection of the Security Instrument and the meeting of all of our other conditions and will continue for one hundred and twenty (120) months. You may obtain credit advances during the Draw Period. After the Draw Period ends, the Repayment Period will begin, and you will no longer be able to obtain credit advances. The length of the Repayment Period is one hundred and eighty (180) months depending on the repayment schedule set forth below. You agree that we may renew or extend the period during which you may obtain credit advances or make payments.

4. **Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of      SEVENTY-FIVE THOUSAND AND 00/100 DOLLAR($      75,000) which will be your Credit Limit under this Agreement.
You may not request an Advance from your Account that would cause your outstanding balance of Advances to exceed your Credit Limit nor are we obligated to pay any Advance request that would cause your outstanding balance of Advances to exceed your Credit Limit. If we do make an Advance that causes your outstanding balance of Advances to exceed your Credit Limit, this will not constitute an increase in your Credit Limit. You agree to immediately repay the amount by which your outstanding balance of Advances exceeds your Credit Limit.

5. **Security.** All amounts due under the Account are secured by a mortgage, deed of trust, or security deed ("Security Instrument") on the Property identified on page one of this Agreement. Borrower agrees to pay all amounts due, and perform all covenants and obligations required of Borrower under the Security Instrument. If it becomes necessary for us to advance funds to you above the Credit Limit to protect our security interest, those amounts in excess of the Credit Limit will be owed by you and will be secured by the Security Instrument unless Applicable Law prohibits the same. The Security Instrument and this Agreement are related documents and a default under either document will be treated as a default under both documents. To the extent permitted by Applicable Law, the lien of the Security Instrument will continue and will have the same priority if, with your consent, we renew, extend, amend, modify or substitute this Agreement. In such event, you agree to execute any additional documents necessary to achieve the action being taken.

6. **Terms And Definitions.** The following terms are defined as set forth in this Section. Other terms are defined elsewhere in this Agreement.
   A. **"Billing Cycle"** is an interval of time that occurs regularly during the term of this Agreement and is used to determine the **FINANCE CHARGES** and other fees, charges, and credit insurance premiums that are due on your Account. The number of days in each Billing Cycle may vary from time to time. A Billing Cycle occurs regardless of whether there is a balance or any activity on your Account. Your Billing Cycle is stated on page 1 of this Agreement.
   B. **"Billing Statement"** is a statement that we will furnish to you periodically that provides important information regarding your Account activity.
   C. **"Credit Limit"** is the maximum aggregate amount of principal that we will extend to you under this Agreement. Your Credit Limit may change under certain circumstances. Your Credit Limit is stated on page 1.
   D. **"Draw Period"** is the period of time during which you may request Advances from your Account. The Draw Period is stated on page 1.
   E. **"Maturity Date"** is the date on which the entire Account Balance under this Agreement is due. The Maturity Date of your Account is stated on page 1.
   F. **"Minimum Payment"** is the minimum amount you must pay on your Credit Account, as reflected on each periodic Billing Statement for each Billing Cycle. Your Minimum Payment during the Draw Period and during the Repayment Period will be calculated as described below under the heading "Payments."

RUSSELL D HOLTZ/995071641701240

G.  "**Outstanding Balance**" is the new balance of the Account, which includes, if applicable, principal, accrued interest on the outstanding principal, fees and charges, Property Expenses and any voluntary insurance, Borrowers' Protection Plan, or Line Protection™ Plan.

H.  "**Property Expenses**" are expenses we incur because you do not fulfill all obligations of the Security Instrument on the Property that secures this Account.

I.  "**Repayment Period**" is the period of time that begins at the end of the Draw Period. During the Repayment Period, you may no longer request Advances from your Account.

J.  "**Variable Rate Balance**" is the balance during the Draw Period that equals the Outstanding Balance that is not part of a Fixed Rate Loan Option.

K.  "**Variable Rate Principal Balance**" is the principal balance that is not payable under a Fixed Rate Loan Option.

7.  **Payments.**

A.  **During the Draw Period.** During the Draw Period, the Total Minimum Payment Due is equal to the sum of: (1) the Variable Rate Balance Minimum Payment (described below); (2) the payment due, if any, for any outstanding Fixed Rate Loan Option; and any past due amounts from prior Billing Cycles. Some Fixed Rate Loan Options may have a different due date and are not figured into the Total Minimum Payment Due. At any time you may pay more than the Total Minimum Payment Due, make additional payments or pay in full or in part the Outstanding Balance. You will be required to pay the Minimum Payment Due each month there is an Outstanding Balance on your Account.

You may choose any of the following monthly payment options. Your billing statement will reflect the option you have chosen. You may change your Draw Period payment option at a later time.

B.  **Variable Rate Balance Minimum Payment.** Your "**Variable Rate Balance**" is all of your Outstanding Balance that is not part of a Fixed Rate Loan Option. Depending on which payment option you choose for the Draw Period, the Variable Rate Balance Minimum Payment may vary. The Variable Rate Balance Minimum Payment will not be less than the amount of accrued interest and any voluntary insurance, plus any unpaid fees.

1.  **Payment Options:**

a. **Interest Only (Plus Insurance) Option** - The Minimum Payment if you elect the Interest Only (Plus Insurance) Option will be the amount of accrued interest plus any voluntary insurance, and unpaid fees.

b. **1.5% of Variable Rate Outstanding Balance Option** - The Minimum Payment if you elect the 1.5% of Variable Rate Outstanding Balance Option will be one and one half percent (1.5%) of the Variable Rate Outstanding Balance plus unpaid fees, or fifty dollars ($50), whichever is greater, or the outstanding Variable Rate Balance if less than the Minimum Payment under this option.

c. **Fixed Payment Option.** The Minimum Payment if you elect the Fixed Payment Option will be at least one and one half percent (1.5%) of the Credit Limit plus any voluntary insurance, Line Protection™Plan and unpaid fees, or fifty dollars ($50), whichever is greater, or the outstanding Variable Rate Balance if less than the Minimum Payment under this option.

C.  **During the Repayment Period.** During the Repayment Period you will be required to make a payment each month. The length of Repayment Period will vary depending on the Outstanding Balance at the beginning of the Repayment Period, if any Property Expenses are incurred during the Repayment Period, and if you have any Fixed Rate Loan Options. The amount of the Total Minimum Payment due may vary due to increases or decreases in the Index or if there are any Fixed Rate Loan Options that remain unpaid at the beginning of the Repayment Period.

Payments during the Repayment Period will be calculated as follows. The Total Minimum Payment Due will be an amount equal to the greater of 1/180th of the Variable Rate Principal Balance remaining on the last date of the Draw Period, plus accrued interest, unpaid fees, unpaid Property Expenses, or fifty dollars ($50). If there are any Fixed Rate Loan Options that remain unpaid at the start of the Repayment Period, the Fixed Rate Loan Option payment previously established will continue to be billed.

For purposes of this Repayment Options section, the Variable Rate Principal Balance equals the amount of your Credit Limit on which you have not elected to convert to a Fixed Rate Loan as of the start of your Repayment Period.

D.  **Fixed Rate Loan Option Payment Information.** A Fixed Rate Loan Option has a fixed interest rate and fixed term and is payable monthly. You may convert part or all of the Variable Rate Principal Balance, along with accrued interest, fees, and any voluntary insurance charge to a Fixed Rate Loan Option at any time during the Draw Period or the Repayment Period unless you are in default or if your Advance privileges are suspended or terminated. We will help you establish the amount of principal and interest sufficient to amortize the Fixed Rate Loan Option over the term you select. The maximum term of any Fixed Rate Loan Option may not exceed the repayment period maturity date of this Credit Line. The minimum amount for a Fixed Rate Loan Option is $5,000. You may have up to three (3) Fixed Rate Loan Options open at any one time, but may not have more than four (4) Fixed Rate Loan Options open during any one statement period. The Fixed Rate Loan Option ANNUAL PERCENTAGE RATE is the Prime Rate plus the Fixed Rate Loan Option margin of 8.00%. However, we may make lower Fixed Rate Loan Option rates available from time to time. Please contact your Banking Center or Customer Service for the Fixed Rate Loan Option rate currently offered. Your payment will be a fixed dollar amount to be determined at the opening of the Fixed Rate Loan Option. You may arrange a different payment date for each Fixed Rate Loan Option. Fixed Rate Loan Option payments will be billed separately from your Regular Payment in accordance with the schedule you have arranged. For Fixed Rate Loan Options, you will receive a separate bill. However, the Variable Rate Balance statement will show all activity, including payments.

8.  **Receipt of Payments and Payment Application.** All payments made by check, automatic account debit, electronic funds transfer, money order, or other instrument must be received by us at the remittance address on your periodic Billing Statement. Payments received at that address prior to 2:00 PM at the location specified, or a payment made at one of our banking centers in the state or our address indicated as the remittance address by 2:00 PM on any business day will be credited as of the date received. Business days are Monday through Friday, exclusive of legal holidays. If the due date falls on a Saturday, Sunday, or legal holiday, the due date will not be extended. Unless otherwise agreed or required by applicable law, payments and other credits will be applied to **FINANCE CHARGES,** other charges and fees, and principal in any order we choose without notice.

9.  **Advances.** During the Draw Period, you may request Advances from your Account, and any amounts you repay will subsequently be available for Advances, subject to the limitations of this Agreement. If there is more than one of you, each of you may obtain Advances in accordance with the terms of this Agreement. Each of you is individually responsible for payment of the entire Account Balance regardless of who actually requested the Advance.

If there is more than one person authorized to use this Credit Line, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

The words "**Authorized Signer**" on Special Convenience Checks and Bank of America ATM cards or Bank of America Check Card or Account Access cards as used in this Agreement means and includes each person who (a) signs the application for the Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for this Credit Line.

You may obtain Advances under your Credit Line Account as follows.

A.  **Credit Line Checks.** Writing a preprinted "**Special Convenience Check**" that we will supply to you.

B.   **Telephone Request.** Requesting a credit advance from your Account to be applied to your designated account by telephone upon proper identification and in accordance with procedures established by us.   Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your Deposit Account Agreement, you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request when acting upon such instructions believed to be genuine.

C.   **Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

D.   **Automated Teller Machine ("ATM") Access.** (Not available in CT, ID, NY, WA or TX) Using your "Bank of America ATM card or Bank of America Check Card or Account Access Card" at any of our designated ATM locations to withdraw or transfer funds in excess of the available collected balance in the account.

E.   **Bank of America Equity Maximizer VISA Account Access Card (the "Account Access Card").** Visa is a registered trademark of Visa International Service Association. (Not available in CT, ID, NY, WA, or TX) Using the Account Access Card as described in this Agreement.

F.   **Online Banking.** Transferring funds to a deposit account.

G.   **Limitations on the Use of Checks.** We reserve the right not to honor Special Convenience Checks in the following circumstances:

1.   **Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Special Convenience Check.

2.   **Post-dated Checks.** Your Special Convenience Check is post-dated. If a post-dated Special Convenience Check is paid and as a result any other check is returned or not paid, we are not responsible.

3.   **Stolen Checks.** Your Special Convenience Checks have been reported lost or stolen.

4.   **Unauthorized Signatures.** Your Special Convenience Check is not signed by an "Authorized Signer" as defined below.

5.   **Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Special Convenience Check.

6.   **Other Special Convenience Check Limitations.** You may not make a payment on the Account with a Special Convenience Check.  You notify us that you wish to stop payment of Special Convenience Check; however, you will not hold us liable if we try to stop payment of Special Convenience Check and we are unable to do so.  You may try to stop payment on a Special Convenience Check by notifying Customer Service at the number listed on your statement.  Your stop payment order will remain in effect for six (6) months unless renewed.

If we pay any Special Convenience Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Special Convenience Check.  The Special Convenience Check itself will be evidence of your debt to us together with this Agreement.  Our liability, if any, for wrongful dishonor of a check is limited to your actual damages.  Dishonor for any reason as provided in this Agreement is not wrongful dishonor.  We may check each Special Convenience Check along with your periodic Billing Statements; however, your use of each Special Convenience Check will be reflected on your periodic statement as a credit advance.  We do not "certify" Special Convenience Checks drawn on your Credit Line.

H.   **Limitations on the Use of ATM Cards.** We reserve the right not to honor the Bank of America ATM card or Bank of America Check Card or Account Access Cards in the following circumstances:

1.   **Credit Limit Violation.** Your Credit Limit has been or would be exceeded by honoring the Bank of America ATM card or Bank of America Check Card or Account Access Card charge.

2.   **Stolen ATM Cards.** Your Bank of America ATM card or Bank of America Check Card or Account Access Cards have been reported lost or stolen.

3.   **Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we honored the Credit Line charge.

4.   **Other ATM Card Limitations.** If we pay any Advance requested by use of the Bank of America ATM card or Bank of America Check Card or Account Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the Advance.  The Advance itself will be evidence of your debt to us together with this Agreement.  Our liability, if any, for wrongful dishonor of an Advance is limited to your actual damages.  Dishonor for any reason as provided in this Agreement is not wrongful dishonor.  Your use of the Bank of America ATM card or Bank of America Check Card or Account Access Card will be reflected on your periodic statement as a credit advance.

I.   **Transaction Requirements for Account Access Card.** The following transaction limitations will apply to the use of your Credit Line:

1.   **Account Access Card Limitations.** The following transaction limitations will apply to your Credit Line and accessing by other methods.

2.   **Limitations on the Use of Account Access Card.** We reserve the right not to honor the Account Access Card linked to this Credit Line in the following circumstances:

a.   **Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Account Access Card transaction.

b.   **Stolen Account Access Card.** Your Account Access Card has been reported lost or stolen.

c.   **Unauthorized Signatures.** Your Account Access Card is not used by a Borrower who has been issued one.

d.   **Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Account Access Card transaction.

3.   **Other Account Access Card Limitations.** If we pay any Advance requested by use of the Account Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the Advance.  The Advance itself will be evidence of your debt to us together with this Agreement.  Our liability, if any, for wrongful dishonor of an Advance is limited to your actual damages.  Dishonor for any reason as provided in this Agreement is not wrongful dishonor.  Your use of the Account Access Card will be reflected on your periodic statement as a credit advance.

4.   **Liability for Unauthorized Account Access Card Transactions.** You are not liable for unauthorized use of your Account Access Card.  Notify us promptly if you believe your Account Access Card has been lost or stolen or if you discover any unauthorized transactions.  We may require you to provide a written statement regarding claims of unauthorized Account Access Card transactions.

5.   **Limitations on Lender's Liability.** Lender's liability, if any, for wrongful dishonor of any Advance request is limited to Borrower's actual damages.  Lender shall not be liable if any merchant, financial institution or ATM refuses to honor the Account Access Card.

J.   **Lost Special Convenience Checks and Bank of America ATM card or Bank of America CheckCard or Account Access Cards.** If you lose your Special Convenience Checks or Bank of America ATM card or Bank of America Check Card or Account Access Card(s) or if someone is using them without your permission you agree to let us know immediately.  You can notify us of our address shown at the beginning of this Agreement.

K.   **Future Credit Line Services.** Where permitted by applicable law, your application for this Credit Line also serves as a request to receive any new services (such as access devices), which may be available at some future time us one of our services in connection with this Credit Line.  You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered.  You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

RUSSELL  D  HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/06  005 DOCMAGIC, INC.                    Page 3 of 10

DocMagic *800-649-1362*
www.docmagic.com

**L.   Credit Line Special Convenience Check, Telephone Request, In Person Request and ATM Access Limitations.** There are no transaction limitations for the writing of Special Convenience Checks, requesting an Advance by telephone, requesting an Advance in person, or using the ATM.

**10.   Billing Statements.** If you have a balance owing on your Account or have any Account activity, we will send to you a Billing Statement. Billing Statements will show, as applicable, credit advances, **FINANCE CHARGES**, other charges, payments made, other credits, your previous balance, and/or your new balance. Payments will be due as shown on the Billing Statements.

**11.   Automatic Payment.** If you choose to have payments made from a designated account and have arranged with us to do so, we will automatically draft the payment. Drafts will be made on the payment due date or immediately after the payment due date (if the payment due date is on a Saturday, Sunday or legal holiday). If your account does not contain the payment amount due, you understand that it is your obligation without notice from us to make the full payment. Even if you make a manual payment, an automatic payment will be drafted from your designated account, unless you make such manual payment for the full payment due at least three (3) business days prior to the due date; however, if you make less than a full manual payment at least three (3) business days prior to the due date, only the remaining amount currently due will be drafted. To stop an automatic draft, you must contact us at least three (3) business days prior to the scheduled payment draft date. We may accept late payments, partial payments or checks and money orders marked "payment in full" (or similar notations) or payments accompanied by a letter stating that our acceptance of the payment indicates our agreement to the terms set forth in the letter without giving up, waiving or losing any of our rights under law or under this Agreement.

If you have authorized automatic payment above, then the following shall apply:

You hereby authorize the Bank to draft the described account for your loan payments. You agree to the Recurring Automatic Payment Authorization Terms and Conditions that will be enclosed with your Automatic Payment confirmation notice, unless you otherwise notify Lender. If you choose to establish automatic payment to draft your designated Bank of America account, the authorization will remain in full force and effect until the Bank has received written or verbal notification from you of its termination in such time and in such manner as to afford the Bank a reasonable opportunity to act on it. If at any time you select to terminate your automatic payment, your margin will increase by 1/4%.

**12.   ANNUAL PERCENTAGE RATE AND FINANCE CHARGE.**

**A.   When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for Advances under your Credit Line will begin to accrue on the date Advances are posted to your Credit Line. There is no "free ride" period which will allow you to avoid FINANCE CHARGES on your Credit Line Advances.

**B.   How the Balance on which the FINANCE CHARGE is Calculated is Determined.** The cost of the credit through the Credit Line is disclosed as a Finance Charge. Except for some closing costs (indicated in this Agreement), interest will not accrue until a credit advance is made. You will pay interest on each credit advance until it is fully paid off. We will determine the FINANCE CHARGE for each monthly billing period by using the following simple interest rate calculation. A FINANCE CHARGE is calculated daily on the Variable Rate Principal Balance, as defined above in the "Definitions" section of this Agreement, by multiplying the daily periodic rate (as indicated in "How The Rate Used To Calculate The Finance Charge Is Determined ") by the daily Variable Rate Principal Balance.

To get the daily Variable Rate Principal Balance we (i) take the beginning Variable Rate Principal Balance for that day (ii) add to that amount all credit advances and sums advanced by us to fulfill any obligations under a Security Instrument (such as a mortgage, deed of trust, or security agreement), if any, for that day, then (iii) subtract all principal balance payments and credits for the Variable Rate Principal Balance for that day. All of the daily Variable Rate Principal Balance FINANCE CHARGES for the monthly billing cycle are added together to get the total Variable Rate Principal Balance FINANCE CHARGE for the monthly billing cycle. Transaction charges are added to the Variable Rate Principal Balance FINANCE CHARGE to get the total FINANCE CHARGE for the monthly billing cycle. For Fixed Rate Loan Option balances, the estimated FINANCE CHARGE is calculated at the establishment of the Fixed Rate and is included in the fixed payment amount.

**C.   How the Rate Used to Calculate the FINANCE CHARGE is Determined.** The initial Variable Rate Principal Balance daily periodic rate used to compute the Variable Rate Principal Balance FINANCE CHARGE is 1/365th of the initial Variable Rate Principal Balance ANNUAL PERCENTAGE RATE (as indicated under "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE"). The Variable Rate Principal Balance ANNUAL PERCENTAGE RATE is a variable rate involving both an index and a margin, both described under "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE" below. FINANCE CHARGES will accrue on an actual 365-day year basis (366 day year basis for leap year). If, however, you participate in a relationship account with a Bank of America Corporation affiliate (as offered from time to time), the Variable Rate Principal Balance Daily Periodic Rate and the Variable Rate Principal ANNUAL PERCENTAGE RATE may be reduced below the rates stated in this Agreement. The addition of a fee may cause the actual Variable Rate Principal Balance ANNUAL PERCENTAGE RATE for the monthly billing cycle to exceed the Variable Rate Principal Balance ANNUAL PERCENTAGE RATE stated in this Agreement.

If the Index is unavailable for any monthly billing cycle, we will use the Index for the most recently preceding monthly billing cycle in which the Index was available. If the Index ceases to be published during the term of this Agreement, we will select a substitute index and margin. The substitute index will be a historical movement substantially similar to the Index, and the substitute index and margin will result in an ANNUAL PERCENTAGE RATE at the time it is substituted that is substantially similar to the rate in effect at the time the Index became unavailable.

There is no limitation on the size of any interest rate adjustment or the number of interest rate adjustments that may be made on the Credit Line so long as the maximum ANNUAL PERCENTAGE RATE is not exceeded. Any increase or decrease in the Index that occurs would cause a corresponding increase or decrease in the Daily Periodic Rate, ANNUAL PERCENTAGE RATE, FINANCE CHARGES and possibly the Total Minimum Payment Due. You understand that adjustments based on an Index change will be applied automatically to the Credit Line and you will not receive advance notice of that adjustment.

The Finance Charge on a Fixed Rate Loan Option is determined on a simple interest basis. If you make a Fixed Rate Loan Option payment(s) before or after any date, either the amount of your originally scheduled final payment may be lower or higher than the amount initially established or additional payment(s) may be required.

Under some circumstances, your payment will not cover the FINANCE CHARGES that accrue and negative amortization will occur. Negative amortization will increase the total amount you may pay us and reduce the equity in the Property.

**13.   Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent Index, which is the Prime Rate as published daily in the "Money Rates" table of *The Wall Street Journal* (the "Index"). When a range of rates has been published, the higher of the rates will be used. We will use the most recent Index value available to us as of the date of the ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of the Credit Line Account, we may designate a substitute Index (and, if necessary, a new margin) after notice to you.

**A.   Rate Computation.** The ANNUAL PERCENTAGE RATE during the Draw Period is determined using the Index published as of the last business day prior to the first day of the next monthly Billing Statement plus a margin, as shown below, and will be effective on the first day of the next monthly billing cycle.

To determine the Periodic Rate that will apply during your Draw Period we add the margin shown below to the value of the Index and divide the value by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your Draw Period. To determine the Periodic Rate that will apply to your Repayment Period, we add the margin shown below to the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL

RUSSELL D HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  005 DOCMAGIC, INC.    Page 4 of 10    DocMagic *eForms* 800-649-1362
www.docmagic.com

PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This will result in the ANNUAL PERCENTAGE RATE for your Repayment Period. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The current Index is   8 . 2 5 0   % per annum. The margin is    - . 0 1 0   %. The initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line Account are as stated below:

### Current Rates for the Draw Period

| Range of Balances or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| ALL | -.010% | 8.240% | 0.02258% |

### Current Rates for the Repayment Period

| Range of Balances or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| ALL | -.010% | 8.240% | 0.02258% |

B.    **Limits.** The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line Account will increase or decrease as the Index increases or decreases from time to time. There is no limit to the amount by which the ANNUAL PERCENTAGE RATE can increase or decrease over a 1-year period. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect monthly. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the lesser of 24.000% or the maximum rate allowed by applicable law.

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

C.    **Forgo Rate Increases.** If we forgo an ANNUAL PERCENTAGE RATE increase, at the time of a later adjustment we may return to the full Index value plus margin.

14.    **Closing Costs.** In addition to the FINANCE CHARGES which will be added to your Credit Line each billing cycle, you will pay the following fees, including real estate closing and security filing fees:

15.    **Other Charges.** You agree to pay the fees and charges listed below if the circumstances triggering their assessment apply. These fees and charges will be added to the Account balance and are payable as set forth in this Agreement.

A.    **Late Charge:** If we do not receive the amount of your minimum monthly payment in full within ten (10) days after your payment due date, you will pay us a late charge equal to the greater of $10.00 or five percent (5%) of the unpaid portion of your minimum monthly payment.

B.    **Returned Payment Charge:** If a check or any other instrument or payment method with which you have made a payment on the Credit Line Account is returned to us unpaid for any reason, you will be charged a return payment charge of $20.

C.    Returned Special Convenience Check.  $20.

D.    Annual Fee:  $0.

E.    Fixed Rate Conversion Fee:  $0.

F.    **Security Instrument Discharge Fee:**  As permitted by Applicable Law, Lender may request that at the time you payoff your Credit Line, you pay the Lender's cost to record a discharge of the Security Instrument.

16.    **Refund of Fees, Charges, and Costs.** The terms of this Agreement shall be construed to be consistent with Applicable Law. However, if a court of competent jurisdiction or other qualified authority determines that the loan charges and fees described in this Agreement exceed the limits that Applicable Law allows, the following shall occur. First, any such purportedly excessive charges or fees shall be reduced to the permitted amount. Second, any amounts collected that exceed the permitted amount will be returned to you, either by direct payment or by reducing the principal you owe on your Account. Your receipt of a refund made by direct payment to you or credited to your Account will constitute a waiver of any right of action you may have arising out of overcharges or allegedly excessive loan charges or fees.

17.    **Property Insurance; Other Charges.** You agree to obtain property insurance against loss or damage to the Property, in the amounts, for the time period and against the risks that the Security Instrument and/or we require. You may obtain insurance from an insurance carrier of your choice so long as the insurance carrier is acceptable to us. If you fail to purchase and maintain acceptable property insurance, we may purchase insurance for you or on your behalf and at your expense as

described in the Security Instrument. We have no obligation to obtain such insurance. Should we take this action, the equity in the Property and contents thereof may not be protected as you desire. Further, the cost of the insurance may significantly exceed the cost of such insurance that you could have obtained; this cost will be treated as an Advance.

**18.  Additional Rights and Remedies.**  In addition to the rights described elsewhere in this Agreement and in the Security Instrument, we also have the following rights:

**A.  Termination and Acceleration.**  We can terminate your Account and require you to pay us the entire outstanding Account Balance under this Agreement in one payment, and charge you certain fees, if any of the following occur:  1) You engage in fraud or make a material misrepresentation at any time in connection with your Account;  2) We do not receive the full amount of any Minimum Payment due or you fail to meet any of the other repayment terms of this Agreement;  3) Your action or inaction adversely affects the Property or our rights in it (for this purpose, the words "you," "your," and "yours" also refer to the owner of the Property, if different than you).  Examples of these actions or inactions include, but are not limited to:  a) Your death, if you are the sole Borrower on the Account; or the death of all but one Borrower which adversely affects our security; b) Illegal use of the Property, if such use subjects the Property to seizure; c) You transfer all or part of your interest in the Property without our written consent; d) All or part of the Property is taken by condemnation or eminent domain; e) Foreclosure of any senior lien on the Property; f) Failure to maintain required insurance on the Property; g) Waste or destructive use of the Property which adversely affects our security; h) Failure to pay taxes or assessments on the Property; i) Permitting the creation of a senior lien on the Property; j) Filing of a judgment against you, if the amount of the judgment and collateral subject to the judgment is such that our security is adversely affected.

We may, at our option, take lesser action than those described in this Section. Such lesser action may include, without limitation, suspending your Account and not allowing you to obtain any further Advances, reducing your Credit Limit, and/or changing the payment terms on your Account. If we take any such action, this shall not constitute an election of remedies or a waiver of our right to exercise any rights or remedies under the remainder of this Section, the remaining provisions of this Agreement, the Security Instrument, or at law or in equity. We may take action under this Section only after complying with any notice or cure provisions required under Applicable Law. In the event we elect not to terminate the Account or take any lesser action as provided in this Section, we do not forfeit or waive our right to do so at a later time if any of the circumstances described above exists at that time.

**B.  Suspension or Reduction.**  We can refuse to make additional Advances or reduce your Credit Limit during any period of time in which any of the following are in effect:  1) The value of the Property declines significantly below the value as determined by us at the time you applied for your Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity in the Property is reduced by fifty percent (50%) or more, and may include a smaller decline depending on individual circumstances; 2) We reasonably believe you will not be able to meet the repayment requirements set forth in this Agreement due to a material change in your financial circumstances; 3) You are in default of a material obligation in this Agreement, including, without limitation, your failing to make a Minimum Payment on a date that it is due; 4) Government action prevents us from imposing the **ANNUAL PERCENTAGE RATE** provided for in this Agreement; 5) Government action impairs our security interest such that the value of our interest is less than 120 percent of your Credit Limit then in effect; 6) A regulatory agency which supervises us has notified us that continued Advances would constitute an unsafe and unsound practice; 7) The maximum **ANNUAL PERCENTAGE RATE** allowed under this Agreement is reached. If we refuse to make additional Advances or reduce your Credit Limit under this Section, we will send you a written notice stating the reason for such action. If, for any reason, you believe your ability to obtain Advances or your Credit Limit should be reinstated, you must send us a written request for reinstatement and include in the request the reasons why you believe your ability to obtain Advances or your Credit Limit should be reinstated.

**19.  Collection Costs.**  If you are in default and we require you to pay us immediately in full, we may also require that you pay our collection costs and expenses to the extent not prohibited by law. If we bring a lawsuit to collect, you will pay our attorneys' fees and court costs allowed by Applicable Law and set by the court.
**20.  Suspension or Termination by You.**  Each of you has the right, upon proper written notice to us, to suspend the privilege of obtaining new Advances. A request to suspend the privilege of obtaining Advances, even if made only by one of you, will be effective against all of you. Advances will be reinstated upon our receipt and acceptance of a written reinstatement request signed by each of you, provided that no event(s) permitting a suspension then exist.

To do so, you must notify us in writing. If one of you requests termination of the Account, the Account will be terminated for all of you. At our option, we may release some of you from liability under this Agreement and/or under Applicable Law without releasing all of you.

If you cancel your right to Advances under this Agreement, you must notify us and return all Special Convenience Checks and any other access devices. Any use of Special Convenience Checks or other access devices following suspension or termination may be considered fraud. You will also remain liable for any further use of the Special Convenience Checks or other Credit Line access devices not returned to us.

**21.  Effect of Suspension of Your Account.**  If your Account is suspended or terminated for any reason, you will nonetheless remain obligated to pay the Account Balance in accordance with the terms of this Agreement. Upon termination of your Account by either you or us, you must return to us all Checks, Credit Cards, or other Account access devices given to you. If either you or we terminate your Account, you will not be entitled to a refund of any **FINANCE CHARGES**, fees, charges, or credit insurance premiums paid or payable under the Account.
**22.  Change in Terms.**  After you open your Account, we may modify or amend the terms of this Agreement and/or the other loan documents pertaining to the Account if any of the following conditions exist:  1) You consent in writing to our proposed modification or amendment at that time; 2) The modification or amendment unequivocally benefits you throughout the remainder of the term of this Agreement; 3) The modification or amendment results only in an insignificant change to the terms of this Agreement and/or the other loan documents; 4) The modification or amendment involves the substitution of a new Index and Margin, as provided in Section 9 above. Any Account balance on the effective date of any modification or amendment is subject to the modification or amendment
**23.  Prepayment.**  You may prepay all or any amounts owing under this Credit Line at any time without penalty. However, we will be entitled to receive all accrued **FINANCE CHARGES** and any other accrued fees or charges.
**24.  Tax Consequences.**  You acknowledge that we (including our employees and representatives) have given you no assurances, representations or warranties that the **FINANCE CHARGES** and other fees and charges paid on your Account are tax deductible. You should consult your own tax advisor concerning the deductibility of the **FINANCE CHARGES** and other fees and charges for the Account.
**25.  Review of Your Account.**  Upon our request, you will provide us with current financial and credit information and will sign any additional or corrective documents in connection with this Agreement or the Account. You authorize us to release information about you to our affiliates or third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you do not opt out of the applicable policy or as permitted by applicable law. You also authorize us to obtain credit reports on you at any time, at our sole option, and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We also may from time to time obtain a new valuation of the Property that secures the Credit Line at any time, including internal inspection, at our sole option and expense.

RUSSELL D HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA 09/12/05  005 DOCMAGIC, INC.                    Page 6 of 10                    DocMagic *eForms* 800-649-1362
www.docmagic.com

26. **Use of the Credit Line.** You may use the Credit Line Account subject to the following limitations:

A.    **Legal Transactions.** Borrower agrees that Borrower will only use the Credit Line for transactions that are legal where Borrower resides. For example, Internet gambling transactions may be illegal in Borrower's state. Display by an on-line merchant of either Lender's logo or a Card Company's logo does not mean that an Internet transaction is legal where Borrower resides. Lender will not be liable if Borrower engages in an illegal transaction.

B.    **Authorizations.** Some transactions require lender's prior authorization. For security purposes, lender may from time to time place or change limits on the number or amounts of transactions Borrower makes in a day at ATMs or point-of-sale terminals. Such limitations may not be the same at every ATM or point-of-sale terminal. The limitations placed on a "Bank of America ATM Card" or "Bank of America Check Card" when using an ATM or point-of-sale terminal may not be the same as the limitations placed on an Account Access Card used at the same ATM or point-of-sale terminal. No such limits are placed on the number or amounts of transactions Borrower makes: at lender's banking centers, by writing a Special Convenience Check, by conducting an Overdraft Protection transaction (subject to the ATM limits, above), or by telephone. In addition, lender may deny authorization to any method of accessing the Credit Line if the Credit Line has been suspended or terminated or if Lender suspects fraudulent activity, lender shall not be liable for any failure to authorize a transaction for any of these reasons. However, Borrower is liable for any transaction Lender authorizes even if Lender should not have authorized it because Borrower is or would be in default as a result of the transaction.

C.    **No Security Interest on Purchases.** This Agreement does not grant Lender a security interest in purchases Borrower charges to the Credit Line.

D.    **Transactions With Merchants.** (a) If a merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", or "all sales final", or similar language, Borrower will be bound by that policy when Borrower uses the Credit Line to buy goods or services from that merchant. (b) When using the Credit Line to make travel or lodging reservations, Borrower must obtain the merchant's cancellation policy and follow it if Borrower cancels. If Borrower cancels, Borrower must obtain the cancellation number that the merchant is required to give Borrower. The merchant may charge Borrower for a cancelled transaction unless Borrower can provide Lender with a correct cancellation number. If Borrower makes reservations or purchases of any kind, such as lodging reservation for several nights stay or a mail order purchase, the Credit Line may be immediately charged for the full amount of the reservation or purchase, regardless whether Borrower has received the goods or services requested at the time the Credit Line is charged. (c) If Borrower authorizes a merchant to charge the Credit Line for repeat transactions without the Account Access Card, then Borrower must notify the merchant when Borrower wants to discontinue the repeat transactions or if the Credit Line is closed or if a new Credit Line or Account Access Card number is issued by Lender. Otherwise, Borrower will be responsible to Lender for the amount of all such repeat transactions. (d) If Borrower disagrees with a transaction on Borrower's statement or has a dispute with a merchant as a result of a transaction, Borrower will provide Lender with information or assistance Lender reasonably requests. Otherwise, Borrower will pay Lender for any resulting loss Lender has, unless Lender is prohibited by applicable law from holding Borrower liable for Lender's loss. (e) If Borrower makes a transaction in a currency other than U.S. dollars, Visa will convert the charge or credit into a U.S. dollar amount. The conversion rate will be determined using Visa currency conversion procedures that are disclosed to institutions issuing Visa cards. The conversion rate on the processing date may differ from the rate on the date of Borrower's transaction. Currently, Visa uses a currency conversion rate of either: (1) a rate selected by VISA from a range of rates available in the wholesale currency markets for the applicable central processing date, which rate may vary from the rate VISA itself receives or (2) the government mandated rate in effect for the central processing date. In each case, Visa uses the rate in effect one day before the conversion date. In the event Visa chooses to change the currency conversion rate or the day on which the currency conversion rate is determined, then transactions on the Credit Line made in a foreign currency and processed after the change will reflect the change.

E.    **Special Rule for Account Access Card Purchases.** If Borrower has a problem with the quality of goods or services that Borrower purchased with an Account Access Card, and Borrower has tried in good faith to correct the problem with the merchant, Borrower may not have to pay the remaining amount due on the goods or services. Borrower has this protection only when the purchase price was more than $50 and the purchase was made in Borrower's home state or within 100 miles of Borrower's mailing address. (If Lender owns or operates the merchant, or if Lender mailed Borrower the advertisement for the property or services, all purchases are covered regardless of amount or location of purchase.).

F.    **Overdraft Protection and Linked Accounts.** If the Credit Line Account is not blocked, suspended or terminated, you may request that the Credit Line Account be set up to provide overdraft protection for an associated checking or Money Market Savings account. If the total amount of checks, debit card or ATM transactions or other debits for a business day exceeds the available associated account balance, then an Advance will be made from the Credit Line Account ("Overdraft Protection"). If the Credit Line Account is used for Overdraft Protection, the minimum transfer amount is one hundred dollars ($100) and incremental transfer amounts will be in multiples of one hundred dollars ($100). However, if there is not $100 available, but the available Credit Line amount can cover the overdraft transaction, then the amount of the available Credit Line will be advanced to cover the overdraft. For Idaho and Washington, the incremental advance is $25. If the available credit on your Credit Line will not allow a $25 increment to be advanced, no transfer will be made. If the associated account is closed or blocked, Overdraft Protection will stop. If you request that the Credit Line Account be connected to or "linked" to another Bank of America product, you understand and agree that a user on the "linked" account can make a transaction that exceeds the available balance on the "linked" account and cause an Advance to be made. Also, if an ATM access card is given to a user on the "linked" account, that user when using the ATM access card may access the Credit Line Account and obtain an Advance without making a transaction directly on the "linked" account. That user may or may not be a party obligated for this Agreement.

G.    **Skip Payment Feature.** At our discretion, from time to time we may offer a feature that will allow you to skip one or more payments. FINANCE CHARGES will continue to accrue on the principal balance at the applicable interest rate. At the end of the skip payment period, the payment terms of this Agreement will be reinstated automatically without further notice.

27. **Borrowers ProtectionPlan and Line Protection™ Plan** (Borrowers' ProtectionPlan and Line Protection™ Plan are registered trademarks of Bank of America Corporation). Fixed Rate Loan Options may be protected by the Borrowers' Protection Plan, and Variable Rate Balances that are not subject to a Fixed Rate Loan Option may be protected by the Line Protection™ Plan. Protection options for both plans include Disability, Involuntary Unemployment, and Accidental Death; or Disability and Accidental Death; or Involuntary Unemployment and Accidental Death. Borrowers' ProtectionPlan and Line Protection™ Plan are optional and are not required to obtain a Credit Line. For each new Credit Line, you must specifically request Borrowers' ProtectionPlan or Line Protection™ Plan. In addition, you must sign a separate Addendum to your Credit Line Agreement, even if you obtained Borrowers' ProtectionPlan or Line Protection™ Plan for a prior Credit Line Agreement with Bank of America. Two Borrowers may purchase Protection for each Fixed Rate Loan Option, but they must select the same protection option, and there may be restrictions on which Borrowers may apply.

Fees for the Borrowers' ProtectionPlan and Line Protection™ Plan are based on and payable with the regularly scheduled monthly payment of the Credit Line Agreement. Credit Line Agreements require quarterly payments are not eligible for Borrowers' ProtectionPlan. Interest is not charged on the fees for Borrowers' ProtectionPlan or Line Protection™ Plan.

The maximum term of the Borrowers' ProtectionPlan is the shorter of the Credit Line Agreement term or 120 months.

We may allow you to exceed the Credit Limit temporarily and from time to time, to accommodate the premiums for any voluntary insurance or the fees for Borrowers' ProtectionPlan or Line Protection™ Plan.

---

RUSSELL D HOLTZ/995071641701240

BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA 09/12/05  005 DOCMAGIC, INC.                    Page 7 of 10                    *DocMagic eForms* 800-649-1362
                                                                                          www.docmagic.com

There are eligibility requirements, conditions and exclusions that can prevent you from receiving benefits under the Borrowers' Protection Plan or Line Protection™ Plan as set forth in the Addendum describing the plan.

**28.    Miscellaneous.** If this Agreement represents a renewal, modification, extension, substitution or consolidation of an obligation owed to us, then you acknowledge and agree that there are no claims, setoffs, avoidances, counterclaims or defenses or rights to claims, setoffs, avoidances, counterclaims or defenses to payment or enforcement of the prior obligation. If this Agreement is a renewal of a prior note or agreement with you, then it is the intent of the parties that the note or Agreement evidencing the original extension of credit not be extinguished by the renewal unless required by applicable state law. Our records shall be evidence that this Agreement is a renewal.

You agree that if this Agreement is in default, including the failure to make a Minimum Payment by the due date, you will accept calls regarding the collection of this Agreement at any residence or place of employment. The calls can be automatically dialed and a recorded message may be played. You agree such calls will not be "unsolicited calls" for purposes of any federal, state or local law. To improve customer service and security our calls with you may be recorded. You agree that monitoring or recording may be done and that no additional notice to you or additional approval from you is needed. You authorize us, our parent company, Bank of America Corporation (or any successor company) and Bank of America Corporation's affiliates and subsidiaries ("Affiliates") to: (a) obtain other information deemed necessary concerning your credit experience and other information from credit reporting agencies, creditors, and any department of motor vehicle or similar state agency, your employer (past, present and future) and other persons (and all entities may release and/or verify such information to us at any time without notification to you or without your consent), and (b) share information with our Affiliates, except to the extent that you have opted out of such sharing as provided in our Privacy Policy for consumers.

**29.    Entire Understanding.** This Agreement together with the Security Instrument constitutes the entire understanding and agreement between the parties as to the matters set forth in this Agreement and the Security Instrument and supercede all prior understanding and correspondences, written or oral, with respect to the subject hereof.

**30.    Delay in Enforcement.** We reserve the right to defer or delay the date certain changes are to occur without notice and without being liable for such delay or deferment. A court decree for divorce or separation or no-court approved mutual agreement does not affect, eliminate or reduce any person's liability for the Agreement or the Account balance if we are not a party to the decree or agreement.

**31.    Governing Law.** In addition to applicable federal law, this Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of C A L I F O R N I A            , except for matters related to the exportation of interest (as defined by federal law) which will be governed by and interpreted in accordance with the laws of the State of North Carolina. However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction, which is evidenced by the Credit Agreement and this Agreement has been approved, made, and funded, and all necessary loan documents have been accepted by us in the State of North Carolina.

**32.    Severability.** If any portion of this Agreement conflicts with, contradicts or otherwise controverts applicable federal, state, tribal, or local law, then to the extent possible such portion shall be construed as being consistent with such Applicable Law, and further will be deemed changed to the extent necessary to accomplish this end. If any such conflicting or contradicting portion of this Agreement cannot be so construed or changed, it will be deemed severed from this Agreement and will not affect other provisions of this Agreement, which shall be given full effect without regard to the conflicting or contradicting portions.

**33.    Irregular Payments.** We may accept late payments, partial payments, and items marked "payment in full" even if they are not full payments, without losing any of our rights under this Agreement, and you will remain obligated to pay amounts owed under this Agreement. All written communications concerning disputed amounts including any checks or other instruments that indicate a payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations as full satisfaction of a disputed amount must be mailed or delivered to us at the address shown on your periodic statement.

**34.    Waiver of Notice.** Subject to Applicable Law, you waive presentment for payment, demand, protest, and notice of dishonor, notice of acceleration, notice of intent to accelerate, and notice of nonpayment.

**35.    Sending of Notices.** Except as otherwise provided in this Agreement, all notices must be in writing. Notice to any of you shall be deemed notice to all of you. Any Billing Statement or notice to you under this Agreement will be sufficiently given if sent to your address on file in connection with the Account or to a new address of which you have notified us in writing at least 20 calendar days before the sending of the Billing Statement or notice. Any notice that you give to us must be provided to us at the address listed on page 1, or a different address if you are notified of the same.

**36.    Transfer and Assignment.** We may transfer or assign this Credit Line Agreement, the Security Instrument and any other loan document relating to the Account to any person or entity without notice to you. You may not transfer, assign or delegate your duties under this Agreement. Subject to applicable law this Agreement is binding on you, your successors, heirs and personal and legal representatives.

**37.    Assumption.** This Account is not assumable. This means that someone buying the Property may not take over this Account as his/her own obligation on the terms of this Agreement or on any other terms.

**38.    Caption Headings.** Caption headings are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**39. Due On Sale.** The Security Instrument includes the following "due on sale" provision relating to certain sales and transfers of the Property:

"If I sell or transfer all or part of the Property or any interest in the Property (or if my beneficial interest in this Property is altered in any way) without Bank's prior written consent, Bank may, at Bank's option, declare all sums secured by this Deed of Trust to be immediately due and payable."

RUSSELL D HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  005 DOCMAGIC, INC.                    Page 8 of 10

DocMagic eForms 800-649-1362
www.docmagic.com

**Acknowledgement.** You understand and agree to the terms and conditions of this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled *When Your Home Is On the Line: What You Should Know About Home Equity Lines of Credit* provided to you at application.

WITNESS: ACCEPTED AND AGREED TO:

_____    _____    _____    _____
Borrower  RUSSELL  D  HOLTZ           Date      Borrower                              Date

_____    _____    _____    _____
Borrower                             Date      Borrower                              Date

_____    _____    _____    _____
Borrower                             Date      Borrower                              Date

RUSSELL  D  HOLTZ/995071641701240

BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  005 DOCMAGIC, INC.                    Page 9 of 10                    DocMagic *CFrame* 800-649-1362
                                                                                           www.docmagic.com

# BILLING ERROR RIGHTS
## YOUR BILLING RIGHTS

## KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

### NOTIFY US IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later that sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter give us the following information:

Your name and account number;

The dollar amount of the suspected error;

Describe the error and explain, if you can, why you believe there was an error. If you need more information, describe the item you think is wrong.

### YOUR RIGHTS AND RESPONSIBILITIES AFTER WE RECEIVE YOUR WRITTEN NOTICE

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill is correct.

After we receive your letter, we cannot try and collect any amount you question, or report you as delinquent. We can continue to bill you for the amount in question, including FINANCE CHARGES, and we can apply any unpaid amount against your Credit Line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find we made a mistake on your bill, you will not have to pay FINANCE CHARGES related to any questioned amount. If we didn't make a mistake, you may have to pay FINANCE CHARGES, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay us the amount that we think you owe, we may report you as delinquent. However, if your explanation does not satisfy us and you write to us within ten (10) days telling us that you still refuse to pay, we will tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone that we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we can't collect the first $50 of the questioned amount, even if your bill is correct.

RUSSELL D HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  005 DOCMAGIC, INC.                Page 10 of 10

DocMagic *eForms* 800-649-1362
www.docmagic.com

# Exhibit "I"

2007-0009154

Recorded                | REC FEE        16.00
Official Records         |
County of                |
San Benito               |
JOE PAUL GONZALEZ        |
Clerk-Recorder           |
                         | DS
09:05AM 20-Jul-2007      | Page 1 of 4

Recording Requested By:
Bank of America, NA

Record and Return To:
United General Title Ins
Fiserv—27 Inwood Road
ROCKY HILL, CT 06067

Holtz, Russell D

Loan Number: 68249017102999

——————— [Space Above This Line For Recording Data] ———————

## SHORT FORM DEED OF TRUST
### (EQUITY MAXIMIZER        ACCOUNT)

This Deed of Trust is made on  JUNE 14, 2007        by    RUSSELL D HOLTZ

(collectively and individually "Trustor"); PRLAP, INC. ("Trustee"); and   the beneficiary, Bank of America, N.A. ("Bank").   Trustee is a subsidiary of Bank.  Any non-titleholder signs below as Trustor solely for the purpose of subjecting any community property interest in the property described below to this Deed of Trust.  The  words "I," "me," and "my" in this Deed of Trust refer to the Trustor, whether one or more.

**BANK AND I AGREE:**
**1.   Property Security.** For the purpose of securing the obligations described  below, I irrevocably grant, convey, transfer and assign to Trustee, in trust with power of sale, the property located in  SAN BENITO County, California described as follows:
SCHEDULE A ATTACHED HERETO AND MADE A PART OF.

with the street address: 905 SUITER ST, HOLLISTER, CALIFORNIA 95023-4631
and with Parcel No.                                 and including all improvements and fixtures now or later erected on the property, and all easements, rights, appurtenances and fixtures now or later a part of or related to the above described property (collectively the "Property").

**2.   This Deed of Trust secures:**
- All of the obligations of the borrowers under the Disclosure and Loan Agreement dated  JUNE 14, 2007                          , and naming    RUSSELL D HOLTZ

RUSSELL D HOLTZ/995071641701240
CALIFORNIA SHORT FORM DEED OF TRUST
(EQUITY MAXIMIZER       ACCOUNT)
CAHESISF.BOA 02/02/07                                    Page 1 of 3

DocMagic eForms 800-649-1362
www.docmagic.com



as borrowers, for a revolving line of credit account (the "Agreement"), as well as any modifications and renewals of the Agreement. The Agreement provides for a Total Credit Commitment (as defined in the Agreement) of $ 75,000.00 , allows for repeated credit advances drawn against the Total Credit Commitment, and provides for a variable interest rate. By mutual agreement, Bank may increase the Total Credit Commitment ("Increased Credit Commitment"); and

- Trustor's performance of each obligation in this Deed of Trust.

This Deed of Trust will not secure borrowers' obligations under the Agreement in excess of the Total Credit Commitment or Increased Credit Commitment, except for any amounts due to: (a) unpaid interest, or (b) expenses that Bank incurs because obligations of a borrower under the Agreement are not fulfilled (including without limitation, any advances that Bank makes to perform borrowers' duties to pay taxes, insurance, etc.)

**To Protect the Security of this Deed of Trust, I Agree:** By the execution and delivery of this Deed of Trust and the Equity Maximizer Agreement and Disclosure secured hereby, that provisions (3) to (20), inclusive of the fictitious deed of trust recorded in  SAN BENITO  County  JULY 14, 1999  , as Instrument No. 9911184  in Book  and at Page  of the Official Records of the County Recorder of that county, (which provisions, identical in all counties, are printed on the following pages) hereby are adopted and incorporated herein and made a part hereof as though set forth at length; and I will observe and perform such provisions; and that the reference to Property, obligations, and parties in such provisions shall be construed to refer to the Property, obligations, and parties set forth in this Deed of Trust.

Trustor requests that a copy of **ANY NOTICE OF DEFAULT AND ANY NOTICE OF SALE** under this Deed of Trust be mailed to Trustor at the Trustor's address shown below, or if no address is shown, then at the address of the Property.

Mailing Address for Notices: 905 SUITER ST, HOLLISTER, CALIFORNIA
                             95023-4631

    BY SIGNING BELOW, Trustor accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Trustor and recorded with it.

_____ (Seal)      _____ (Seal)
RUSSELL D HOLTZ          -Trustor                              -Trustor


_____ (Seal)      _____ (Seal)
                         -Trustor                              -Trustor


_____ (Seal)      _____ (Seal)
                         -Trustor                              -Trustor


RUSSELL D HOLTZ/995071641701240
CALIFORNIA SHORT FORM DEED OF TRUST
(EQUITY MAXIMIZER      ACCOUNT)
CAHESISF.BOA  02/02/07                    Page 2 of 3

DocMagic 800-649-1362
www.docmagic.com

3

---

[Space Below This Line For Acknowledgment]

State of California                         )
                                            ) ss.
County of _SAN BENITO_____              )

On _June 14, 2007_ before me, _M. Sandoval, Notary Public_____

personally appeared _RUSSELL D HOLTZ_____

_____

_____ ,

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

```
┌─────────────────────────────────┐
│  ⊙   M. SANDOVAL                │          _M Sandoval_____
│      Commission # 1690671       │          NOTARY SIGNATURE
│      Notary Public - California │
│      San Benito County          │          _M Sandoval_____
│      My Comm. Expires Aug 29, 2010│        (Typed Name of Notary)
└─────────────────────────────────┘
```

              NOTARY SEAL

RUSSELL D HOLTZ/995071641701240
CALIFORNIA SHORT FORM DEED OF TRUST
(EQUITY MAXIMIZER          ACCOUNT)
CAHESISF.BOA 02/02/07                    Page 3 of 3

DocMagic ℮Ⓡ 800-649-1362
www.docmagic.com

H165FWRX

*4t*

# EXHIBIT "A"

THE LAND REFERRED TO IN THIS REPORT IS SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF SAN BENITO, AND IS DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIPE AT THE INTERSECTION OF THE EASTERLY LINE OF SUITER STREET, AS CONVEYED TO THE CITY OF HOLLISTER BY DEED FROM CLEMENT B. WILSON, ET AL, DATED JANUARY 2, 1953 AND RECORDED IN VOL. 193 OF OFFICIAL RECORDS, AT PAGE 563, WITH THE NORTHERLY LINE OF LAND CONVEYED TO NICHOLAS HAWKINS BY DEED FROM T.S. HSWKINS DATED OCTOBER 9, 1874 AND RECORDED IN VOL. 1 OF DEEDS, AT PAGE 315; SAID POINT OF BEGINNING BEING NORTH 88 DEG. 27'30" WEST 240.00 FEET FROM THE INTERSECTION OF SAI D NORTHERLY LINE SOUTH 88 DEG. 27'30" EAST 100.00 FEET TO AN IRON PIPE AT THE SOUTHWESTERLY CORNER OF LAND CONVEYED TO C.N. HAWKINS, ET AL TRUSTEES, BY DEED FROM L.S. WOODS AND WIFE, DATED JULY 17, 1891 AND RECORDED IN VOL. 17 OF DEEDS, AT PAGE 214; THENCE ALONG THE WESTERLY LINE OF SAID LAND AND THE PROJECTION THEREOF NORTH 1 DEG. 28' EAST 63.32 FEET TO AN IRON PIPE (AT 45.00 FEET ON THIS COURSE IS AN IRON PIPE AT THE NORTHWESTERLY CORNER OF SAID LAND SO CONVEYED TO C.N. HAWKINS, ET AL, TRUSTEES); THENCE NORTH 88 DEG. 27'30" WEST 100.00 FEET TO AN IRON PIPE IN THE EASTERLY LINE OF SUITER STREET AS DESCRIBED IN DEED TO CITY OF HOLLISTER ABOVE REFERRED TO; THENCE ALONG SAID EASTERLY LINE SOUTH 1 DEG. 28'WEST 63.32 FEET TO THE POINT OF BEGINNING.


KNOWN:        905 SUITER STREET

PARCEL:       055-060-025-0

OWNERS:       RUSSELL D HOLTZ

This is a true and correct copy of the
records in this office.

ATTEST Date: __MAR 1 3 2008__
Joe Paul Gonzalez, County Clerk in and
for the County of San Benito,
State of California.

BY: _____
Deputy

# Exhibit "J"

# NOTICE OF RIGHT TO CANCEL

Loan Number: 68249017102999

Required Signer(s):  RUSSELL D HOLTZ

Property Address:  905 SUITER ST, HOLLISTER, CALIFORNIA 95023-4631

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1.  the date of the transaction, which is   JUNE 14, 2007             ; or
2.  the date you receive your Truth in Lending disclosures; or
3.  the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to   the address below.  If we do not take possession of the money or property within 20 calendar days of your offer,   you may keep it without further obligation.

---

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Bank of America, NA
P.O. BOX 5080
Hartford, CT 06102-5080

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of  JUNE 18, 2007
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL.

_____          _____
Consumer's Signature                                        Date
RUSSELL D HOLTZ

---

### ACKNOWLEDGMENT OF RECEIPT

THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

_____          _____
RUSSELL D HOLTZ                                           Date

RUSSELL D HOLTZ/995071641701240
NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
NORTC.BOA 04/11/07

DocMagic *EZForms* 800-649-1362
www.docmagic.com

# NOTICE OF RIGHT TO CANCEL

Loan Number: 68249017102999

Required Signer(s): RUSSELL D HOLTZ

Property Address: 905 SUITER ST, HOLLISTER, CALIFORNIA 95023-4631

### YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is JUNE 14, 2007          ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to    the address below. If we do not take possession of the money or property within 20 calendar days of your offer,    you may keep it without further obligation.

---

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Bank of America, NA
P.O. BOX 5080
Hartford, CT 06102-5080


You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of  JUNE 18, 2007
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL.


_____          _____
Consumer's Signature                         Date
RUSSELL D HOLTZ

---

### ACKNOWLEDGMENT OF RECEIPT

THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.


_____          _____
RUSSELL D HOLTZ                              Date

RUSSELL D HOLTZ/995071641701240
NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
NORTC.BOA 04/11/07

DocMagic *eFas* 800-649-1362
www.docmagic.com

## NOTICE OF RIGHT TO CANCEL

Loan Number: 68249017102999

Required Signer(s):   RUSSELL D HOLTZ

Property Address:   905 SUITER ST, HOLLISTER, CALIFORNIA 95023-4631

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1.  the date of the transaction, which is   JUNE 14, 2007          ; or
2.  the date you receive your Truth in Lending disclosures; or
3.  the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to  the address below. If we do not take possession of the money or property within 20 calendar days of your offer,  you may keep it without further obligation.

<div style="border:1px solid black">

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Bank of America, NA
P.O. BOX 5080
Hartford, CT 06102-5080

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of   JUNE 18, 2007
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL.**

_____          _____
Consumer's Signature                              Date
RUSSELL D HOLTZ

</div>

**ACKNOWLEDGMENT OF RECEIPT**

THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

_____          _____
RUSSELL D HOLTZ                                   Date

RUSSELL D HOLTZ/995071641701240
NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
NORTC.BOA 04/11/07

DocMagic *eFfarms* 800-649-1362
www.docmagic.com

## NOTICE OF RIGHT TO CANCEL

Loan Number: 68249017102999

Required Signer(s):  RUSSELL D HOLTZ

Property Address:  905 SUITER ST, HOLLISTER, CALIFORNIA 95023-4631

### YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is  JUNE 14, 2007          ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to  the address below. If we do not take possession of the money or property within 20 calendar days of your offer,  you may keep it without further obligation.

---

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Bank of America, NA
P.O. BOX 5080
Hartford, CT 06102-5080

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of  JUNE 18, 2007
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL.

Consumer's Signature                                         Date
RUSSELL D HOLTZ

---

### ACKNOWLEDGMENT OF RECEIPT

THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

RUSSELL D HOLTZ                          Date

RUSSELL D HOLTZ/995071641701240
NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
NORTC.BOA  04/11/07

DocMagic *eForms* 800-649-1362
www.docmagic.com

# Exhibit "K"

# CONSUMER LAW CENTER, INC.

Fred W. Schwinn
fred.schwinn@sjconsumerlaw.com

12 South First Street, Suite 1014
San Jose, CA  95113-2418

(408) 294-6100
Fax (408) 294-6190

March 21, 2008

Bank of America, N.A.
c/o CT Corporation System, Agent for Service
818 West Seventh Street
Los Angeles, CA  90017-3407

**CERTIFIED MAIL**
**7007 0710 0001 0498 6639**

Bank of America, N.A.
9000 Southside Boulevard, Bldg. 700
Jacksonville, FL  32256-0790

**CERTIFIED MAIL**
**7007 0710 0000 0498 6646**

Bank of America, N.A.
10850 White Rock Road, 1st Floor
Rancho Cordova, CA  95670-6044

**CERTIFIED MAIL**
**7007 0710 0001 0498 6653**

Bank of America, N.A.
Loss Mitigation
P.O. Box 9000
Getzville, NY  14068-9904

**CERTIFIED MAIL**
**7007 0710 0001 0498 6660**

PRLAP, Inc.
101 South Tryon Street
Charlotte, NC  28280-0002

**CERTIFIED MAIL**
**7007 0710 0001 0498 6677**

PRLAP, Inc.
c/o CT Corporation System, Agent for Service
818 West Seventh Street
Los Angeles, CA  90017-3407

**CERTIFIED MAIL**
**7007 0710 0001 0498 6684**

Re:     Russell Don Holtz
        905 Suiter Street
        Hollister, California  95023
        Loan No. 6824-9017-102999

Dear Sir/Madam:

This office represents Russell Don Holtz concerning the above referenced loan transaction which he entered into with Bank of America, N.A., on or about June 14, 2007.  We have been authorized by our client to rescind this transaction and hereby exercise that right pursuant to the Federal Truth in Lending Act (TILA), 15 U.S.C. § 1635 and Regulation Z, 12 C.F.R. § 226.15.

- 1 -

Bank of America, N.A., failed the provide the TILA disclosures to our client or the TILA disclosures provided to our client failed to meet the requirements of the Federal Truth in Lending Act and Regulation Z in the following respects:

(a)  Our client was not provided the proper disclosures that are required by the Federal Truth in Lending Act, 15 U.S.C. § 1635(a) and Regulation Z § 226.15, in that our client was not provided with a proper disclosure of the notice of right to rescind as required by Regulation Z § 226.15(b) in a credit transaction in which a security interest was retained or acquired in our clients' principal dwelling.

As a result of these violations of the Truth in Lending Act and Regulation Z, the security interest held by Bank of America, N.A., is void upon our client's rescission.  See 15 U.S.C. § 1635 and 12 C.F.R. § 226.15.  Pursuant to the TILA and Regulation Z, you have twenty days after receipt of this notice of rescission to return to our client all monies paid and to take action necessary or appropriate to reflect termination of the security interest on our client's principal dwelling.

Please be advised that if you do not cancel the security interest and return all consideration paid by our client you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

Very Truly Yours,

Fred W. Schwinn

cc:    Russell Don Holtz

- 2 -

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | $2.65 |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $5.21 |

03/21/2008

Sent To Bank of America NA
Street, Apt. No.; or PO Box No. West Seventh St
City, State, ZIP+4 Los Angeles CA 90017-3407

PS Form 3800, August 2006    See Reverse for Instructions

7007 0710 0001 0498 6639

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $0.41 |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | $2.15 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $5.21 |

03/21/2008

Sent To Bank of America NA
Street, Apt. No.; or PO Box No. Southside Blvd Bldg 700
City, State, ZIP+4 Jacksonville FL 32256-8790

PS Form 3800, August 2006    See Reverse for Instructions

7007 0710 0001 0498 6646

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $0.41 |
| Certified Fee | $2.65 |
| Return Receipt Fee (Endorsement Required) | $1.95 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $5.21 |

03/21/2008

Sent To Bank of America NA
Street, Apt. No.; or PO Box No. White Rock Rd
City, State, ZIP+4 Rancho Cordova CA 956...

PS Form 3800, August 2006    See Reverse for Instructions

7007 0710 0001 0498 6653

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $0.41 |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | $2.15 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $5.21 |

03/21/2008

Sent To Bank of America NA
Street, Apt. No.; or PO Box No. Box 1000
City, State, ZIP+4 Getzville NY 14068-9704

PS Form 3800, August 2006    See Reverse for Instructions

7007 0710 0001 0498 6660

---



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | $2.65 |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $5.21 |

03/21/2008

Sent To PRLAP Inc
Street, Apt. No.; or PO Box No. South Tryon St
City, State, ZIP+4 Charlotte NC 28255

PS Form 3800, August 2006    See Reverse for Instructions

7007 0710 0001 0498 6677

---



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | $2.65 |
| Return Receipt Fee (Endorsement Required) | $2.15 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $5.21 |

03/21/2008

Sent To PRLAP Inc
Street, Apt. No.; or PO Box No. West Seventh St
City, State, ZIP+4 Los Angeles CA 90017-3407

PS Form 3800, August 2006    See Reverse for Instructions

7007 0710 0001 0498 6684

# Exhibit "L"

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bank of America, NA
% CT Corp. Sys. Agent for Service
818 West Seventh St.
Los Angeles, CA
90017-3407

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Rudy Rivera_   ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
RUDY RIVERA

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Transfer from service label)
7007 0710 0001 0498 6639

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bank of America NA
9000 Southside Blvd.
Bldg 700
Jacksonville, FL
32256-0790

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

MAR 24 2008

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Transfer from service label)
7007 0710 0001 0498 6646

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X V2Hr
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

Bank of America, NA
10850 WhiteRock Rd.
1st fl.
Rancho Cordova, CA
95670-6044

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchant
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 6653

PS Form 3811, February 2004    Domestic Return Receipt    1025

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  K.A. Geary
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

MAR 24 2008

1. Article Addressed to:

Bank of America, NA
Loss Mitigation
P.O. Box 9000
Getzville, NY
14068-9904

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 6660

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X  Rudy Rivera
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

PRLAP, Inc.
c/o CT Corp. System,
agent for service
818 West Seventh St.
Los Angeles, CA 90017-3407

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 6684

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

# Exhibit "M"



Executive Customer Relations

April 14, 2008

Mr. Fred W. Schwinn
Consumer Law Center, Inc.
12 South First Street Suite 1014
San Jose, CA 95113

Re: Russell Holtz / Right to Rescind

Dear Mr. Schwinn:

This letter is in response to your letter of March 21, 2008 sent to our Executive Offices on behalf of Mr. Holtz right to rescind on his Equity Maximizer Agreement. Thank you for the opportunity to respond.

A review of the account records indicate the Mr. Holtz Equity Maximizer was made on June 14, 2007 with a credit limit of $75,000.00, with a variable interest rate and a draw period of 120 months. Enclosed is a copy of that agreement for your review.

The rescinding period would begin on June 15, 2007 and expire midnight June 18, 2007. Since the state of California counts Saturday as a business day, unless it falls on a holiday, Mr. Holtz was given three business days to cancel his contract. Enclosed is a copy of the "Notice of Right to Cancel" signed by Mr. Holtz.

In conclusion, we trust that the information and documents provided in this letter will help to alleviate any concerns you may have regarding this matter. It is based upon these facts that Bank of America finds that the referenced loan is not voidable.

If you need additional information regarding this matter, please do not hesitate to contact me directly.

Sincerely,

Judy Kelly, AVP
Customer Advocate
Office of the Chairman
336.805.4183

# BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT
# AND DISCLOSURE STATEMENT

**Property Serving as Security (the "Property"):** 905 SUITER ST, HOLLISTER, SAN BENITO, CALIFORNIA 95023-4631
**Borrower's Name and Address:** RUSSELL D HOLTZ, 905 SUITER, HOLLISTER, CALIFORNIA 95023

**Lender's Name and Address:** Bank of America, NA, National Banking Association, 100 North Tryon Street, Charlotte, North Carolina 28255

| | | |
|---|---|---|
| **Date:** JUNE 14, 2007 | **Annual Percentage Rate:** 8.2400 | **Draw Period:** 120 Mos. |
| **Loan Number:** 68249017102999 | **Margin:** -.0100 | **Repayment Period:** 180 Mos. |
| **Maturity Date:** JUNE 14, 2032 | **Max. Interest Rate:** 24.0000 | **Billing Cycle:** MONTHLY |
| **Credit Limit:** $75,000.00 | | |

1.    **Introduction.** This Bank of America Equity Maximizer Agreement and Disclosure Statement ("Agreement") governs your Home Equity Line of Credit Account (your "Credit Line" or "Account") with the lender named above ("Lender"). Your Account is a revolving credit arrangement in which we make loans to you by advancing funds ("Advances") at your direction, allowing you to repay those Advances and take additional Advances, subject to the terms of this Agreement. This Agreement will remain in full force and effect notwithstanding that the Account Balance under the Agreement may occasionally be reduced to an amount equal to or less than zero.

In this Agreement, the terms "we," "us," "our" and "Bank" refer to the Lender or to any subsequent assignee or transferee. Except as noted below, the terms "you," "your," "yours" and "Borrower" refer to each person that signs this Agreement or has authority to use the Credit Line. Read this Agreement carefully so that you know how your Account works and keep a copy of this Agreement for your records.

2.    **Borrower's Promise to Pay.** You promise to pay to Lender the total of all Advances plus FINANCE CHARGES plus all fees and charges under the terms of this Agreement. You will pay your Account according to the terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

3.    **Term.** The term of your Account will begin as of the date of this Agreement ("Opening Date") and will continue until all indebtedness under this Agreement, if not already paid pursuant to the payment provision below, will be due and payable upon maturity. The Draw Period of your Account will begin on the date after the Opening Date, when this Agreement is accepted by us in the State of North Carolina, following the perfection of the Security Instrument and the meeting of all of our other conditions and will continue for one hundred and twenty (120) months. You may obtain credit advances during the Draw Period. After the Draw Period ends, the Repayment Period will begin, and you will no longer be able to obtain credit advances. The length of the Repayment Period is one hundred and eighty (180) months depending on the repayment schedule set forth below. You agree that we may renew or extend the period during which you may obtain credit advances or make payments.

4.    **Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of    SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS        75,000.00,which will be your Credit Limit under this Agreement. You may not request an Advance from your Account that would cause your outstanding balance of Advances to exceed your Credit Limit nor are we obligated to pay any Advance request that would cause your outstanding balance of Advances to exceed your Credit Limit. If we do make an Advance that causes your outstanding balance of Advances to exceed your Credit Limit, this will not constitute an increase in your Credit Limit. You agree to immediately repay the amount by which your outstanding balance of Advances exceeds your Credit Limit.

5.    **Security.** All amounts due under the Account are secured by a mortgage, deed of trust, or security deed ("Security Instrument") on the Property identified on page one of this Agreement. Borrower agrees to pay all amounts due, and perform all covenants and obligations required of Borrower under the Security Instrument. If it becomes necessary for us to advance funds to you above the Credit Limit to protect our security interest, those amounts in excess of the Credit Limit will be owed by you and will be secured by the Security Instrument unless Applicable Law prohibits the same. The Security Instrument and this Agreement are related documents and a default under either document will be treated as a default under both documents. To the extent permitted by Applicable Law, the lien of the Security Instrument will continue and will have the same priority if, with your consent, we renew, extend, amend, modify or substitute this Agreement. In such event, you agree to execute any additional documents necessary to achieve the action being taken.

6.    **Terms And Definitions.** The following terms are defined as set forth in this Section. Other terms are defined elsewhere in this Agreement.

    A.    "**Billing Cycle**" is an interval of time that occurs regularly during the term of this Agreement and is used to determine the FINANCE CHARGES and other fees, charges, and credit insurance premiums that are due on your Account. The number of days in each Billing Cycle may vary from time to time. A Billing Cycle occurs regardless of whether there is a balance or any activity on your Account. Your Billing Cycle is stated on page 1 of this Agreement.

    B.    "**Billing Statement**" is a statement that we will furnish to you periodically that provides important information regarding your Account activity.

    C.    "**Credit Limit**" is the maximum aggregate amount of principal that we will extend to you under this Agreement. Your Credit Limit may change under certain circumstances. Your Credit Limit is stated on page 1.

    D.    "**Draw Period**" is the period of time during which you may request Advances from your Account. The Draw Period is stated on page 1.

    E.    "**Maturity Date**" is the date on which the entire Account Balance under this Agreement is due. The Maturity Date of your Account is stated on page 1.

    F.    "**Minimum Payment**" is the minimum amount you must pay on your Credit Account, as reflected on each periodic Billing Statement for each Billing Cycle. Your Minimum Payment during the Draw Period and during the Repayment Period will be calculated as described below under the heading "Payments."

RUSSELL D HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA 09/12/05 005 DOCMAGIC, INC.                                                    Page 1 of 10

DocMagic *eF***** 800-649-1362
www.docmagic.com

G.   "**Outstanding Balance**" is the new balance of the Account, which includes, if applicable, principal, accrued interest on the outstanding principal, fees and charges, Property Expenses and any voluntary insurance, Borrowers' Protection Plan, or Line Protection™ Plan.

H.   "**Property Expenses**" are expenses we incur because you do not fulfill all obligations of the Security Instrument for the Property that secures this Account.

I.   "**Repayment Period**" is the period of time that begins at the end of the Draw Period. During the Repayment Period, you may no longer request Advances from your Account.

J.   "**Variable Rate Balance**" is the balance during the Draw Period that equals the Outstanding Balance that is not part of a Fixed Rate Loan Option.

K.   "**Variable Rate Principal Balance**" is the principal balance that is not payable under a Fixed Rate Loan Option.

7.   Payments.

A.   **During the Draw Period.** During the Draw Period, the Total Minimum Payment Due is equal to the sum of: (1) the Variable Rate Balance Minimum Payment (described below); (2) the payment due, if any, for any outstanding Fixed Rate Loan Option; and any past due amounts from prior Billing Cycles. Some Fixed Rate Loan Options may have a different due date and are not figured into the Total Minimum Payment Due. At any time you may pay more than the Total Minimum Payment Due, make additional payments or pay in full or in part the Outstanding Balance. You will be required to pay the Minimum Payment Due each month there is an Outstanding Balance on your Account.

You may choose any of the following monthly payment options. Your billing statement will reflect the option you have chosen. You may change your Draw Period payment option at a later time.

B.   **Variable Rate Balance Minimum Payment.** Your "Variable Rate Balance" is all of your Outstanding Balance that is not part of a Fixed Rate Loan Option. Depending on which payment option you choose for the Draw Period, the Variable Rate Balance Minimum Payment may vary. The Variable Rate Balance Minimum Payment will not be less than the amount of accrued interest and any voluntary insurance, plus any unpaid fees.

1.   **Payment Options:**

a.   **Interest Only (Plus Insurance) Option** - The Minimum Payment if you elect the Interest Only (Plus Insurance) Option will be the amount of accrued interest plus any voluntary insurance, and unpaid fees.

b.   **1.5% of Variable Rate Outstanding Balance Option** - The Minimum Payment if you elect the 1.5% of Variable Rate Outstanding Balance Option will be one and one half percent (1.5%) of the Variable Rate Outstanding Balance plus unpaid fees, or fifty dollars ($50), whichever is greater, or the outstanding Variable Rate Balance if less than the Minimum Payment under this option.

c.   **Fixed Payment Option.** The Minimum Payment if you elect the Fixed Payment Option will be at least one and one half percent (1.5%) of the Credit Limit plus any voluntary insurance, Line Protection™ Plan and unpaid fees, or fifty dollars ($50), whichever is greater, or the outstanding Variable Rate Balance if less than the Minimum Payment under this option.

C.   **During the Repayment Period.** During the Repayment Period you will be required to make a payment each month. The length of Repayment Period will vary depending on the Outstanding Balance at the beginning of the Repayment Period, if any Property Expenses are incurred during the Repayment Period, and if you have any Fixed Rate Loan Options. The amount of the Total Minimum Payment due may vary due to increases or decreases in the Index or if there are any Fixed Rate Loan Options that remain unpaid at the beginning of the Repayment Period.

Payments during the Repayment Period will be calculated as follows. The Total Minimum Payment Due will be an amount equal to the greater of 1/180th of the Variable Rate Principal Balance remaining on the last date of the Draw Period, plus accrued interest, unpaid fees, unpaid Property Expenses, or fifty dollars ($50). If there are any Fixed Rate Loan Options that remain unpaid at the start of the Repayment Period, the Fixed Rate Loan Options payment previously established will continue to be billed.

For purposes of this Repayment Options section, the Variable Rate Principal Balance equals the amount of your Credit Limit on which you have not elected to convert to a Fixed Rate Loan as of the start of your Repayment Period.

D.   **Fixed Rate Loan Option Payment Information.** A Fixed Rate Loan Option has a fixed interest rate and fixed term and is payable monthly. You may convert part or all of the Variable Rate Principal Balance, along with accrued interest, fees, and any voluntary insurance charge to a Fixed Rate Loan Option at any time during the Draw Period or the Repayment Period unless you are in default or if your Advance privileges are suspended or terminated. We will help you establish the amount of principal and interest sufficient to amortize the Fixed Rate Loan Option over the term you select. The maximum term of any Fixed Rate Loan Option may not exceed the repayment period maturity date of this Credit Line. The minimum amount for a Fixed Rate Loan Option is $5,000. You may have up to three (3) Fixed Rate Loan Options open at any one time, but may not have more than four (4) Fixed Rate Loan Options open during any one statement period. The Fixed Rate Loan Option ANNUAL PERCENTAGE RATE is the Prime Rate plus the Fixed Rate Loan Option margin of 8.00%. However, we may make lower Fixed Rate Loan Option rates available from time to time. Please contact your Banking Center or Customer Service for the Fixed Rate Loan Option rate currently offered. Your payment will be a fixed dollar amount to be determined at the opening of the Fixed Rate Loan Option. You may arrange a different payment date for each Fixed Rate Loan Option. Fixed Rate Loan Option payments will be billed separately from your Regular Payment in accordance with the schedule you have arranged. For Fixed Rate Loan Options, you will receive a separate bill. However, the Variable Rate Balance statement will show all activity, including payments.

8.   Receipt of Payments and Payment Application. All payments made by check, automatic account debit, electronic funds transfer, money order, or other instrument must be received by us at the remittance address on your periodic Billing Statement. Payments received at that address prior to 2:00 PM at the location specified, or a payment made at one of our banking centers in the state or our address indicated as the remittance address by 2:00 PM on any business day will be credited as of the date received. Business days are Monday through Friday, exclusive of legal holidays. If the due date falls on a Saturday, Sunday, or legal holiday, the due date will not be extended. Unless otherwise agreed or required by applicable law, payments and other credits will be applied to FINANCE CHARGES, other charges and fees, and principal in any order we choose without notice.

9.   Advances. During the Draw Period, you may request Advances from your Account, and any amounts you repay will subsequently be available for Advances, subject to the limitations of this Agreement. If there is more than one of you, each of you may obtain Advances in accordance with the terms of this Agreement. Each of you is individually responsible for payment of the entire Account Balance regardless of who actually requested the Advance.

If there is more than one person authorized to use this Credit Line, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

The words "**Authorized Signer**" on Special Convenience Checks and Bank of America ATM cards or Bank of America Check Card or Account Access cards as used in this Agreement means and includes each person who (a) signs the application for the Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for this Credit Line.

You may obtain Advances under your Credit Line Account as follows.

A.   **Credit Line Checks.** Writing a preprinted "**Special Convenience Check**" that we will supply to you.

RUSSELL D BOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA 09/12/05 005 DOCMAGIC, INC.                    Page 2 of 10                    DocMagic *eFORMS* 800-649-1362
                                                                                          www.docmagic.com

B.  **Telephone Request.** Requesting a credit advance from your Account to be applied to your designated account by telephone upon proper identification and in accordance with procedures established by us. Except for transactions covered by the federal Electronic Fund Transfer Act and unless otherwise agreed in your Deposit Account Agreement, you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request when acting upon such instructions believed to be genuine.

C.  **Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

D.  **Automated Teller Machine ("ATM") Access.** (Not available in CT, ID, NY, WA or TX) Using your "Bank of America ATM card or Bank of America Check Card or Account Access Card" at any of our designated ATM locations to withdraw or transfer funds in excess of the available collected balance in the account.

E.  **Bank of America Equity Maximizer VISAAccount Access Card (the "Account Access Card").** (Not available in CT, ID, NY, WA, or TX) Using the Account Access Card as described in this Agreement. Visa is a registered trademark of Visa International Service Association.

F.  **Online Banking.** Transferring funds to a deposit account.

G.  **Limitations on the Use of Checks.** We reserve the right not to honor Special Convenience Checks in the following circumstances:

1.  **Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Special Convenience Check.
2.  **Post-dated Checks.** Your Special Convenience Check is post-dated. If a post-dated Special Convenience Check is paid and as a result any other check is returned or not paid, we are not responsible.
3.  **Stolen Checks.** Your Special Convenience Checks have been reported lost or stolen.
4.  **Unauthorized Signatures.** Your Special Convenience Check is not signed by an "Authorized Signer" as defined below.
5.  **Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Special Convenience Check.
6.  **Other Special Convenience Check Limitations.** You may not make a payment on the Account with a Special Convenience Check. You notify us that you wish to stop payment of a Special Convenience Check; however, you will not hold on liable if we try to stop payment of Special Convenience Check and we are unable to do so. You may try to stop payment on a Special Convenience Check by notifying Customer Service at the number listed on your statement. Your stop payment order will remain in effect for six (6) months unless renewed.

If we pay any Special Convenience Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Special Convenience Check. The Special Convenience Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Special Convenience Checks along with your periodic Billing Statement; however, your use of each Special Convenience Check will be reflected on your periodic statement as a credit advance. We do not "certify" Special Convenience Checks drawn on your Credit Line.

H.  **Limitations on the Use of ATM Cards.** We reserve the right not to honor the Bank of America ATM card or Bank of America Check Card or Account Access Card in the following circumstances:

1.  **Credit Limit Violation.** Your Credit Limit has been or would be exceeded by honoring the Bank of America ATM card or Bank of America Check Card or Account Access Card charge.
2.  **Stolen ATM Cards.** Your Bank of America ATM card or Bank of America Check Card or Account Access Cards have been reported lost or stolen.
3.  **Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Credit Line charge.
4.  **Other ATM Card Limitations.** If we pay any Advance requested by use of the Bank of America ATM card or Bank of America Check Card or Account Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the Advance. The Advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an Advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Bank of America ATM card or Bank of America Check Card or Account Access Card will be reflected on your periodic statement as a credit advance.

I.  **Transaction Requirements for Account Access Card.** The following transaction limitations will apply to the use of your Credit Line:

1.  **Account Access Card Limitations.** The following transaction limitations will apply to your Credit Line and accessing by other methods.
2.  **Limitations on the Use of Account Access Card.** We reserve the right not to honor the Account Access Card linked to this Credit Line in the following circumstances:

   a.  **Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Account Access Card transaction.
   b.  **Stolen Account Access Card.** Your Account Access Card has been reported lost or stolen.
   c.  **Unauthorized Signatures.** Your Account Access Card is not used by a Borrower who has been issued one.
   d.  **Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in the Agreement or could be if we paid the Account Access Card transaction.

3.  **Other Account Access Card Limitations.** If we pay any Advance requested by use of the Account Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the Advance. The Advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an Advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Account Access Card will be reflected on your periodic statement as a credit advance.

4.  **Liability for Unauthorized Account Access Card Transactions.** You are not liable for unauthorized use of your Account Access Card. Notify us promptly if you believe your Account Access Card has been lost or stolen or if you discover any unauthorized transactions. We may require you to provide a written statement regarding claims of unauthorized Account Access Card transactions.

   **Limitations on Lender's Liability.** Lender's liability, if any, for wrongful dishonor of any Advance request is limited to Borrower's actual damages. Lender shall not be liable if any merchant, financial institution or ATM refuses to honor the Account Access Card.

J.  **Lost Special Convenience Checks and Bank of America ATM card or Bank of America Check Card or Account Access Cards.** If you lose your Special Convenience Checks or Bank of America ATM card or Bank of America Check Card or Account Access Card(s) or if someone is using them without your permission you agree to let us know immediately. You can notify us at our address shown at the beginning of this Agreement.

K.  **Future Credit Line Services.** Where permitted by applicable law, your application for this Credit Line also serves as a request to receive any new services (such as access devices), which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**L.   Credit Line Special Convenience Check, Telephone Request, In Person Request and ATM Access Limitations.**  There are no transaction limitations for the writing of Special Convenience Checks, requesting an Advance by telephone, requesting an Advance in person, or using the ATM.

**10.   Billing Statements.**  If you have a balance owing on your Account or have any Account activity, we will send to you a Billing Statement. Billing Statements will show, as applicable, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your previous balance, and/or your new balance. Payments will be due as shown on the Billing Statements.

**11.   Automatic Payment.**  If you choose to have payments made from a designated account and have arranged with us to do so, we will automatically draft the payment. Drafts will be made on the payment due date or immediately after the payment due date (if the payment due date is on a Saturday, Sunday or legal holiday). If your account does not contain the payment amount due, you understand that it is your obligation without notice from us to make the full payment. Even if you make a manual payment, an automatic payment will be drafted from your designated account, unless you make such manual payment for the full payment due at least three (3) business days prior to the due date; however, if you make less than a full manual payment at least three (3) business days prior to the due date, only the remaining amount currently due will be drafted. To stop an automatic draft, you must contact us at least three (3) business days prior to the scheduled payment draft date. We may accept late payments, partial payments or checks and money orders marked "payment in full" (or similar notations) or payments accompanied by a letter stating that our acceptance of the payment indicates our agreement to the terms set forth in the letter without giving up, waiving or losing any of our rights under law or under this Agreement.

If you have authorized automatic payment above, then the following shall apply:

You hereby authorize the Bank to draft the described account for your loan payment. You agree to the Recurring Automatic Payment Authorization Terms and Conditions that will be enclosed with your Automatic Payment confirmation notice, unless you otherwise notify Lender. If you choose to establish automatic payment to draft your designated Bank of America account, the authorization will remain in full force and effect until the Bank has received written or verbal notification from you of its termination in such time and in such manner as to afford the Bank a reasonable opportunity to act on it. If at any time you select to terminate your automatic payment, your margin will increase by 1/4%.

**12.   ANNUAL PERCENTAGE RATE AND FINANCE CHARGE.**

**A.   When FINANCE CHARGES Begin to Accrue.**  Periodic FINANCE CHARGES for Advances under your Credit Line will begin to accrue on the date Advances are posted to your Credit Line. There is no "free ride" period which will allow you to avoid FINANCE CHARGES on your Credit Line Advances.

**B.   How the Balance on which the FINANCE CHARGE is Calculated is Determined.**  The cost of the credit through the Fixed Rate Loan Option is disclosed as a Finance Charge. Except for some closing costs (indicated in this Agreement), interest will not accrue until a credit advance is made. You will pay interest on each credit advance until it is fully paid off. We will determine the FINANCE CHARGE for each monthly billing period by using the following simple interest rate calculation. A FINANCE CHARGE is calculated daily on the Variable Rate Principal Balance, as defined above in the "Definitions" section of this Agreement, by multiplying the daily periodic rate (as indicated in "How The Rate Used To Calculate The Finance Charge Is Determined ") by the daily Variable Rate Principal Balance.

To get the daily Variable Rate Principal Balance we (i) take the beginning Variable Rate Principal Balance for that day (ii) add to that amount all credit advances and sums advanced by us to fulfill any obligations under a Security Instrument (such as a mortgage, deed of trust, or security agreement), if any, for that day, then (iii) subtract all principal balance payments and credits for the Variable Rate Principal Balance for that day. All of the daily Variable Rate Principal Balance FINANCE CHARGES for the monthly billing cycle are added together to get the total Variable Rate Principal Balance FINANCE CHARGE for the monthly billing cycle. Transaction charges are added to the Variable Rate Principal Balance FINANCE CHARGE to get the total FINANCE CHARGE for the monthly billing cycle. For Fixed Rate Loan Option balances, the estimated FINANCE CHARGE is calculated at the establishment of the Fixed Rate and is included in the fixed payment amount.

**C.   How the Rate Used to Calculate the FINANCE CHARGE is Determined.**  The initial Variable Rate Principal Balance daily periodic rate used to compute the Variable Rate Principal Balance FINANCE CHARGE is 1/365th of the initial Variable Rate Principal Balance ANNUAL PERCENTAGE RATE (as indicated under "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE"). The Variable Rate Principal Balance ANNUAL PERCENTAGE RATE is a variable rate involving both an index and a margin, both described under "Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE" below. FINANCE CHARGES will accrue on an actual 365-day year basis (366 day year basis for leap year). If, however, you participate in a relationship account with a Bank of America Corporation affiliate (as offered from time to time), the Variable Rate Principal Balance Daily Periodic Rate and the Variable Rate Principal ANNUAL PERCENTAGE RATE may be reduced below the rates stated in this Agreement. The addition of a fee may cause the actual Variable Rate Principal Balance ANNUAL PERCENTAGE RATE for the monthly billing cycle to exceed the Variable Rate Principal Balance ANNUAL PERCENTAGE RATE stated in this Agreement.

If the Index is unavailable for any monthly billing cycle, we will use the Index for the most recently preceding monthly billing cycle in which the Index was available. If the Index ceases to be published during the term of this Agreement, we will select a substitute index and margin. The substitute index will be a historical movement substantially similar to the Index, and the substitute index and margin will result in an ANNUAL PERCENTAGE RATE at the time it is substituted that is substantially similar to the rate in effect at the time the Index became unavailable.

There is no limitation on the size of any interest rate adjustment or the number of interest rate adjustments that may be made on the Credit Line so long as the maximum ANNUAL PERCENTAGE RATE is not exceeded. Any increase or decrease in the Index that occurs would cause a corresponding increase or decrease in the Daily Periodic Rate, ANNUAL PERCENTAGE RATE, FINANCE CHARGES and possibly the Total Minimum Payment Due. You understand that adjustments based on an Index change will be applied automatically to the Credit Line and you will not receive advance notice of that adjustment.

The Finance Charge on a Fixed Rate Loan Option is determined on a simple interest basis. If you make a Fixed Rate Loan Option payment(s) before or after any date, either the amount of your originally scheduled final payment may be lower or higher than the amount initially established or additional payment(s) may be required.

Under some circumstances, your payment will not cover the FINANCE CHARGES that accrue and negative amortization will occur. Negative amortization will increase the total amount you may pay us and reduce the equity in the Property.

**13.   Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.**  We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent Index, which is the Prime Rate as published daily in the "Money Rates" table of *The Wall Street Journal* (the "Index"). When a range of rates has been published, the higher of the rates will be used. We will use the most recent Index value available to us as of the date of the ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of the Credit Line Account, we may designate a substitute Index (and, if necessary, a new margin) after notice to you.

**A.   Rate Computation.**  The ANNUAL PERCENTAGE RATE during the Draw Period is determined using the Index published as of the last business day prior to the first day of the next monthly Billing Statement plus a margin, as shown below, and will be effective on the first day of the next monthly billing cycle.

To determine the Periodic Rate that will apply during your Draw Period we add the margin shown below to the value of the Index and divide the value by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your Draw Period. To determine the Periodic Rate that will apply to your Repayment Period, we add the margin shown below to the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL

RUSSELL D HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05   005 DOCMAGIC, INC.                    Page 4 of 10                    DocMagic *eFarms* 800-649-1362
www.docmagic.com

PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This will result in the ANNUAL PERCENTAGE RATE for your Repayment Period. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The current Index is    8.250    % per annum. The margin is    -.010    %. The initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line Account are as stated below:

### Current Rates for the Draw Period

| Range of Balances or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| ALL | -.010% | 8.240% | 0.02258% |

### Current Rates for the Repayment Period

| Range of Balances or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| ALL | -.010% | 8.240% | 0.02258% |

B. **Limits.** The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line Account will increase or decrease as the Index increases or decreases from time to time. There is no limit to the amount by which the ANNUAL PERCENTAGE RATE can increase or decrease over a 1-year period. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect monthly. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the lesser of 24.000% or the maximum rate allowed by applicable law.

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

C. **Forgo Rate Increases.** If we forgo an ANNUAL PERCENTAGE RATE increase, at the time of a later adjustment we may return to the full Index value plus margin.

14. **Closing Costs.** In addition to the FINANCE CHARGES which will be added to your Credit Line each billing cycle, you will pay the following fees, including real estate closing and security filing fees:

15. **Other Charges.** You agree to pay the fees and charges listed below if the circumstances triggering their assessment apply. These fees and charges will be added to the Account balance and are payable as set forth in this Agreement.

A. **Late Charge:** If we do not receive the amount of your minimum monthly payment in full within ten (10) days after your payment due date, you will pay us a late charge equal to the greater of $10.00 or five percent (5%) of the unpaid portion of your minimum monthly payment.

B. **Returned Payment Charge:** If a check or any other instrument or payment method with which you have made a payment on the Credit Line Account is returned to us unpaid for any reason, you will be charged a return payment charge of $20.

C. **Returned Special Convenience Check:** $20.

D. **Annual Fee:** $0.

E. **Fixed Rate Conversion Fee:** $0.

F. **Security Instrument Discharge Fee:** As permitted by Applicable Law, Lender may request that at the time you payoff your Credit Line, you pay the Lender's cost to record a discharge of the Security Instrument.

16. **Refund of Fees, Charges, and Costs.** The terms of this Agreement shall be construed to be consistent with Applicable Law. However, if a court of competent jurisdiction or other qualified authority determines that the loan charges and fees described in this Agreement exceed the limits that Applicable Law allows, the following shall occur. First, any such purportedly excessive charges or fees shall be reduced to the permitted amount. Second, any amounts collected that exceed the permitted amount will be returned to you, either by direct payment or by reducing the principal you owe on your Account. Your receipt of a refund made by direct payment to you or credited to your Account will constitute a waiver of any right of action you may have arising out of overcharges or allegedly excessive loan charges or fees.

17. **Property Insurance; Other Charges.** You agree to obtain property insurance against loss or damage to the Property, in the amounts, for the time period and against the risks that the Security Instrument and/or we require. You may obtain insurance from an insurance carrier of your choice so long as the insurance carrier is acceptable to us. If you fail to purchase and maintain acceptable property insurance, we may purchase insurance for you or on your behalf and at your expense as

described in the Security Instrument. We have no obligation to obtain such insurance. Should we take this action, the equity in the Property and contents thereof may not be protected as you desire. Further, the cost of the insurance may significantly exceed the cost of such insurance that you could have obtained; this cost will be treated as an Advance.

18.   **Additional Rights and Remedies.**  In addition to the rights described elsewhere in this Agreement and in the Security Instrument, we also have the following rights:

A.   **Termination and Acceleration.**  We can terminate your Account and require you to pay us the entire outstanding Account Balance under this Agreement in one payment, and charge you certain fees, if any of the following occur: 1) You engage in fraud or make a material misrepresentation at any time in connection with your Account; 2) We do not receive the full amount of any Minimum Payment due or you fail to meet any of the other repayment terms of this Agreement; 3) Your action or inaction adversely affects the Property or our rights in it (for this purpose, the words "you," "your," and "yours" also refer to the owner of the Property, if different than you). Examples of these actions or inactions include, but are not limited to: a) Your death, if you are the sole Borrower on the Account; or the death of all but one Borrower which adversely affects our security; b) Illegal use of the Property, if such use subjects the Property to seizure; c) You transfer all or part of your interest in the Property without our written consent; d) All or part of the Property is taken by condemnation or eminent domain; e) Foreclosure of any senior lien on the Property; f) Failure to maintain required insurance on the Property; g) Waste or destructive use of the Property which adversely affects our security; h) Failure to pay taxes or assessments on the Property; i) Permitting the creation of a senior lien on the Property; j) Filing of a judgment against you, if the amount of the judgment and collateral subject to the judgment is such that our security is adversely affected.

We may, at our option, take lesser action than those described in this Section. Such lesser action may include, without limitation, suspending your Account and not allowing you to obtain any further Advances, reducing your Credit Limit, and/or changing the payment terms on your Account. If we take any such action, this shall not constitute an election of remedies or a waiver of our right to exercise any rights or remedies under the remainder of this Section, the remaining provisions of this Agreement, the Security Instrument, or at law or in equity. We may take action under this Section only after complying with any notice or cure provisions required under Applicable Law. In the event we elect not to terminate the Account or take any lesser action as provided in this Section, we do not forfeit or waive our right to do so at a later time if any of the circumstances described above exists at that time.

B.   **Suspension or Reduction.**  We can refuse to make additional Advances or reduce your Credit Limit during any period of time in which any of the following are in effect:  1) The value of the Property declines significantly below the value as determined by us at the time you applied for your Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity in the Property is reduced by fifty percent (50%) or more, and may include a smaller decline depending on individual circumstances; 2) We reasonably believe you will not be able to meet the repayment requirements set forth in this Agreement due to a material change in your financial circumstances; 3) You are in default of a material obligation in this Agreement, including, without limitation, your failing to make a Minimum Payment on a date that it is due; 4) Government action prevents us from imposing the **ANNUAL PERCENTAGE RATE** provided for in this Agreement; 5) Government action impairs our security interest such that the value of our interest is less than 120 percent of your Credit Limit then in effect; 6) A regulatory agency which supervises us has notified us that continued Advances would constitute an unsafe and unsound practice; 7) The maximum **ANNUAL PERCENTAGE RATE** allowed under this Agreement is reached. If we refuse to make additional Advances or reduce your Credit Limit under this Section, we will send you a written notice stating the reason for such action. If, for any reason, you believe your ability to obtain Advances or your Credit Limit should be reinstated, you must send us a written request for reinstatement and include in the request the reasons why you believe your ability to obtain Advances or your Credit Limit should be reinstated.

19.   **Collection Costs.**  If you are in default and we require you to pay us immediately in full, we may also require that you pay our collection costs and expenses to the extent not prohibited by law. If we bring a lawsuit to collect, you will pay our attorneys' fees and court costs allowed by Applicable Law and set by the court.

20.   **Suspension or Termination by You.**  Each of you has the right, upon proper written notice to us, to suspend the privilege of obtaining new Advances. A request to suspend the privilege of obtaining Advances, even if made only by one of you, will be effective against all of you. Advances will be reinstated upon our receipt and acceptance of a written reinstatement request signed by each of you, provided that no other(s) permitting a suspension then exists.

To do so, you must notify us in writing. If one of you requests termination of the Account, the Account will be terminated for all of you. At our option, we may release some of you from liability under this Agreement and/or under Applicable Law without releasing all of you.

If you cancel your right to Advances under this Agreement, you must notify us and return all Special Convenience Checks and any other access devices. Any use of Special Convenience Checks or other access devices following suspension or termination may be considered fraud. You will also remain liable for any further use of the Special Convenience Checks or other Credit Line access devices not returned to us.

21.   **Effect of Suspension of Your Account.**  If your Account is suspended or terminated for any reason, you will nonetheless remain obligated to pay the Account Balance in accordance with the terms of this Agreement. Upon termination of your Account by either you or us, you must return to us all Checks, Credit Cards, or other Account access devices given to you. If either you or we terminate your Account, you will not be entitled to a refund of any **FINANCE CHARGES,** fees, charges, or credit insurance premiums paid or payable under the Account.

22.   **Change in Terms.**  After you open your Account, we may modify or amend the terms of this Agreement and/or the other loan documents pertaining to the Account if any of the following conditions exist: 1) You consent in writing to our proposed modification or amendment at that time; 2) The modification or amendment unequivocally benefits you throughout the remainder of the term of this Agreement; 3) The modification or amendment results only in an insignificant change to the terms of this Agreement and/or the other loan documents; 4)  The modification or amendment involves the substitution of a new Index and Margin, as provided in Section 9 above. Any Account balance on the effective date of any modification or amendment is subject to the modification or amendment

23.   **Prepayment.**  You may prepay all or any amounts owing under this Credit Line at any time without penalty. However, we will be entitled to receive all accrued **FINANCE CHARGES** and any other accrued fees or charges.

24.   **Tax Consequences.**  You acknowledge that we (including our employees and representatives) have given you no assurances, representations or warranties that the **FINANCE CHARGES** and other fees and charges paid on your Account are tax deductible. You should consult your own tax advisor concerning the deductibility of the **FINANCE CHARGES** and other fees and charges for the Account.

25.   **Review of Your Account.**  Upon our request, you will provide us with current financial and credit information and will sign any additional or corrective documents in connection with this Agreement or the Account. You authorize us to release information about you to our affiliates or third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you do not opt out of the applicable policy or as permitted by applicable law. You also authorize us to obtain credit reports on you at any time, at our sole option, and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We also may from time to time obtain a new valuation of the Property that secures the Credit Line at any time, including internal inspection, at our sole option and expense.

26. **Use of the Credit Line.** You may use the Credit Line Account subject to the following limitations:

A. **Legal Transactions.** Borrower agrees that Borrower will only use the Credit Line for transactions that are legal where Borrower resides. For example, Internet gambling transactions may be illegal in Borrower's state. Display by an on-line merchant of either Lender's logo or a Card Company's logo does not mean that an Internet transaction is legal where Borrower resides. Lender will not be liable if Borrower engages in an illegal transaction.

B. **Authorizations.** Some transactions require lender's prior authorization. For security purposes, lender may from time to time place or change limits on the number or amounts of transactions Borrower makes in a day at ATMs or point-of-sale terminals. Such limitations may not be the same at every ATM or point-of-sale terminal. The limitations placed on a "Bank of America ATM Card" or "Bank of America Check Card" when using an ATM or point-of-sale terminal may not be the same as the limitations placed on an Account Access Card used at the same ATM or point-of-sale terminal. No such limits are placed on the number or amounts of transactions Borrower makes: at lender's banking centers, by writing a Special Convenience Check, by conducting an Overdraft Protection transaction (subject to the ATM limits, above), or by telephone. In addition, lender may deny authorization to any method of accessing the Credit Line if the Credit Line has been suspended or terminated or if Lender suspects fraudulent activity, lender shall not be liable for any failure to authorize a transaction for any of these reasons. However, Borrower is liable for any transaction Lender authorizes even if Lender should not have authorized it because Borrower is or would be in default as a result of the transaction.

C. **No Security Interest on Purchases.** This Agreement does not grant Lender a security interest in purchases Borrower charges to the Credit Line.

D. **Transactions With Merchants** (a) If a merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", or "all sales final", or similar language, Borrower will be bound by that policy when Borrower uses the Credit Line to buy goods or services from that merchant. (b) When using the Credit Line to make travel or lodging reservations, Borrower must obtain the merchant's cancellation policy and follow it if Borrower cancels. If Borrower cancels, Borrower must obtain the cancellation number that the merchant is required to give Borrower. The merchant may charge Borrower for a cancelled transaction unless Borrower can provide Lender with a correct cancellation number. If Borrower makes reservations or purchases of any kind, such as lodging reservation for several nights stay or a mail order purchase, the Credit Line may be immediately charged for the full amount of the reservation or purchase, regardless whether Borrower has received the goods or services requested at the time the Credit Line is charged. (c) If Borrower authorizes a merchant to charge the Credit Line for repeat transactions without the Account Access Card, then Borrower must notify the merchant when Borrower wants to discontinue the repeat transactions or if the Credit Line is closed or if a new Credit Line or Account Access Card number is issued by Lender. Otherwise, Borrower will be responsible to Lender for the amount of all such repeat transactions. (d) If Borrower disagrees with a transaction on Borrower's statement or has a dispute with a merchant as a result of a transaction, Borrower will provide Lender with information or assistance Lender reasonably requests. Otherwise, Borrower will pay Lender for any resulting loss Lender has, unless Lender is prohibited by applicable law from holding Borrower liable for Lender's loss. (e) If Borrower makes a transaction in a currency other than U.S. dollars, Visa will convert the charge or credit into a U.S. dollar amount. The conversion rate will be determined using Visa currency conversion procedures that are disclosed to institutions issuing Visa cards. The conversion rate on the processing date may differ from the rate on the date of Borrower's transaction. Currently, Visa uses a currency conversion rate of either: (1) a rate selected by VISA from a range of rates available in the wholesale currency markets for the applicable central processing date, which rate may vary from the rate VISA itself receives or (2) the government mandated rate in effect for the central processing date. In each case, Visa uses the rate in effect one day before the conversion date. In the event Visa chooses to change the currency conversion rate or the day on which the currency conversion rate is determined, then transactions on the Credit Line made in a foreign currency and processed after the change will reflect the change.

E. **Special Rule for Account Access Card Purchases.** If Borrower has a problem with the quality of goods or services that Borrower purchased with an Account Access Card, and Borrower has tried in good faith to correct the problem with the merchant, Borrower may not have to pay the remaining amount due on the goods or services. Borrower has this protection only when the purchase price was more than $50 and the purchase was made in Borrower's home state or within 100 miles of Borrower's mailing address. (If Lender owns or operates the merchant, or if Lender mailed Borrower the advertisement for the property or services, all purchases are covered regardless of amount or location of purchase.).

F. **Overdraft Protection and Linked Accounts.** If the Credit Line Account is not blocked, suspended or terminated, you may request that the Credit Line Account be set up to provide overdraft protection for an associated checking or Money Market Savings account. If the total amount of checks, debit card or ATM transactions or other debits for a business day exceeds the available associated account balance, then an Advance will be made from the Credit Line Account ("Overdraft Protection"). If the Credit Line Account is used for Overdraft Protection, the minimum transfer amount is one hundred dollars ($100) and incremental transfer amounts will be in multiples of one hundred dollars ($100). However, if there is not $100 available, but the available Credit Line amount can cover the overdraft transaction, then the amount of the available Credit Line will be advanced to cover the overdraft. For Idaho and Washington, the incremental advance is $25. If the available credit on your Credit Line will not allow a $25 increment to be advanced, no transfer will be made. If the associated account is closed or blocked, Overdraft Protection will stop. If you request that the Credit Line Account be connected to or "linked" to another Bank of America product, you understand and agree that a user on the "linked" account can make a transaction that exceeds the available balance on the "linked" account and cause an Advance to be made. Also, if an ATM access card is given to a user on the "linked" account, that user when using the ATM access card may access the Credit Line Account and obtain an Advance without making a transaction directly on the "linked" account. That user may or may not be a party obligated for this Agreement.

G. **Skip Payment Feature.** At our discretion, from time to time we may offer a feature that will allow you to skip one or more payments. FINANCE CHARGES will continue to accrue on the principal balance at the applicable interest rate. At the end of the skip payment period, the payment terms of this Agreement will be reinstated automatically without further notice.

27. **Borrowers ProtectionPlan and Line Protection™ Plan** (Borrowers' ProtectionPlan and Line Protection™ Plan are registered trademarks of Bank of America Corporation). Fixed Rate Loan Options may be protected by the Borrowers' ProtectionPlan, and Variable Rate Balances that are not subject to a Fixed Rate Loan Option may be protected by the Line Protection™ Plan. Protection options for both plans include Disability, Involuntary Unemployment, and Accidental Death; or Disability and Accidental Death; or Involuntary Unemployment and Accidental Death. Borrowers' ProtectionPlan and Line Protection™ Plan are optional and are not required to obtain a Credit Line. For each new Credit Line, you must specifically request Borrowers' ProtectionPlan or Line Protection™ Plan. In addition, you must sign a separate Addendum to your Credit Line Agreement, even if you obtained Borrowers' ProtectionPlan or Line Protection™ Plan for a prior Credit Line Agreement with Bank of America. Two Borrowers may purchase Protection for each Fixed Rate Loan Option, but they must select the same protection option, and there may be restrictions on which Borrowers may apply.

Fees for the Borrowers' ProtectionPlan and Line Protection™ Plan are based on and payable with the regularly scheduled monthly payment of the Credit Line Agreement. Credit Line Agreements repaid in quarterly payments are not eligible for the Borrowers' ProtectionPlan. Interest is not charged on the fees for Borrowers' ProtectionPlan or Line Protection™ Plan.

The maximum term of the Borrowers' ProtectionPlan is the shorter of the Credit Line Agreement term or 120 months.

We may allow you to exceed the Credit Limit temporarily and from time to time, to accommodate the premiums for any voluntary insurance or the fees for Borrowers' ProtectionPlan or Line Protection™ Plan.

RUSSELL D HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA 09/12/05 065 DOCMAGIC, INC.    Page 7 of 10

DocMagic eFᴏʀᴍꜱ 800-649-1362
www.docmagic.com

There are eligibility requirements, conditions and exclusions that can prevent you from receiving benefits under the Borrowers' Protection Plan or Line Protection™ Plan as set forth in the Addendum describing the plan.

**28.  Miscellaneous.**  If this Agreement represents a renewal, modification, extension, substitution or consolidation of an obligation owed to us, then you acknowledge and agree that there are no claims, setoffs, avoidances, counterclaims or defenses or rights to claims, setoffs, avoidances, counterclaims or defenses to payment or enforcement of the prior obligation.  If this Agreement is a renewal of a prior note or agreement with you, then it is the intent of the parties that the note or Agreement evidencing the original extension of credit not be extinguished by the renewal unless required by applicable state law.  Our records shall be evidence that this Agreement is a renewal.

You agree that if this Agreement is in default, including the failure to make a Minimum Payment by the due date, you will accept calls regarding the collection of this Agreement at any residence or place of employment.  The calls can be automatically dialed and a recorded message may be played.  You agree such calls will not be "unsolicited calls" for purposes of any federal, state or local law.  To improve customer service and security our calls with you may be recorded.  You agree that monitoring or recording may be done and that no additional notice to you or additional approval from you is needed.  You authorize us, our parent company, Bank of America Corporation (or any successor company) and Bank of America Corporation's affiliates and subsidiaries ("Affiliates") to: (a) obtain other information deemed necessary concerning your credit experience and other information from credit reporting agencies, creditors, and any department of motor vehicle or similar state agency, your employer (past, present and future) and other persons (and all entities may release and/or verify such information to us at any time without notification to you or without your consent), and (b) share information with our Affiliates, except to the extent that you have opted out of such sharing as provided in our Privacy Policy for consumers.

**29.  Entire Understanding.**  This Agreement together with the Security Instrument constitutes the entire understanding and agreement between the parties as to the matters set forth in this Agreement and the Security Instrument and supercede all prior understanding and correspondences, written or oral, with respect to the subject hereof.

**30.  Delay in Enforcement.**  We reserve the right to defer or delay the date certain changes are to occur without notice and without being liable for such delay or deferment.  A court decree for divorce or separation or no-court approved mutual agreement does not affect, eliminate or reduce any person's liability for the Agreement or the Account balance if we are not a party to the decree or agreement.

**31.  Governing Law.**  In addition to applicable federal law, this Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of **C A L I F O R N I A**              , except for matters related to the exportation of interest (as defined by federal law) which will be governed by and interpreted in accordance with the laws of the State of North Carolina.  However, if there ever is a question about whether any provision of this Agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable.  The loan transaction, which is evidenced by the Credit Agreement and this Agreement has been approved, made, and funded, and all necessary loan documents have been accepted by us in the State of North Carolina.

**32.  Severability.**  If any portion of this Agreement conflicts with, contradicts or otherwise controverts applicable federal, state, tribal, or local law, then to the extent possible such portion shall be construed as being consistent with such Applicable Law, and further will be deemed changed to the extent necessary to accomplish this end.  If any such conflicting or contradicting portion of this Agreement cannot be so construed or changed, it will be deemed severed from this Agreement and will not affect other provisions of this Agreement, which shall be given full effect without regard to the conflicting or contradicting portions.

**33.  Irregular Payments.**  We may accept late payments, partial payments, and items marked "payment in full" even if they are not full payments, without losing any of our rights under this Agreement, and you will remain obligated to pay amounts owed under this Agreement.  All written communications concerning disputed amounts including any checks or other instruments that indicate a payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations as full satisfaction of a disputed amount must be mailed or delivered to us at the address shown on your periodic statement.

**34.  Waiver of Notice.**  Subject to Applicable Law, you waive presentment for payment, demand, protest, and notice of dishonor, notice of acceleration, notice of intent to accelerate, and notice of nonpayment.

**35.  Sending of Notices.**  Except as otherwise provided in this Agreement, all notices must be in writing.  Notice to any of you shall be deemed notice to all of you.  Any Billing Statement or notice to you under this Agreement will be sufficiently given if sent to your address on file in connection with the Account or to a new address of which you have notified us in writing at least 20 calendar days before the sending of the Billing Statement or notice.  Any notice that you give to us must be provided to us at the address listed on page 1, or a different address if you are notified of the same.

**36.  Transfer and Assignment.**  We may transfer or assign this Credit Line Agreement, the Security Instrument and any other loan document relating to the Account to any person or entity without notice to you.  You may not transfer, assign or delegate your duties under this Agreement.  Subject to applicable law this Agreement is binding on you, your successors, heirs and personal and legal representatives.

**37.  Assumption.**  This Account is not assumable.  This means that someone buying the Property may not take over this Account as his/her own obligation on the terms of this Agreement or on any other terms.

**38.  Caption Headings.**  Caption headings are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**39. Due On Sale.**  The Security Instrument includes the following "due on sale" provision relating to certain sales and transfers of the Property:

"If I sell or transfer all or part of the Property or any interest in the Property (or if my beneficial interest in this Property is altered in any way) without Bank's prior written consent, Bank may, at Bank's option, declare all sums secured by this Deed of Trust to be immediately due and payable."

RUSSELL D HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  095 DOCMAGIC, INC.                    Page 8 of 10

DocMagic ⓔFᴏʀᴍs 800-649-1362
www.docmagic.com

Acknowledgement. You understand and agree to the terms and conditions of this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled *When Your Home Is On the Line: What You Should Know About Home Equity Lines of Credit* provided to you at application.

WITNESS: ACCEPTED AND AGREED TO:

| | | |
|---|---|---|
| Borrower  RUSSELL  D. HOLTZ | Date  6/14/07 | Borrower _____ Date |
| Borrower _____ | Date | Borrower _____ Date |
| Borrower _____ | Date | Borrower _____ Date |

## BILLING ERROR RIGHTS
## YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

### NOTIFY US IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR BILL

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later that sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter give us the following information:

Your name and account number;

The dollar amount of the suspected error,

Describe the error and explain, if you can, why you believe there was an error. If you need more information, describe the item you think is wrong.

### YOUR RIGHTS AND RESPONSIBILITIES AFTER WE RECEIVE YOUR WRITTEN NOTICE

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill is correct.

After we receive your letter, we cannot try and collect any amount you question, or report you as delinquent. We can continue to bill you for the amount in question, including FINANCE CHARGES, and we can apply any unpaid amount against your Credit Line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find we made a mistake on your bill, you will not have to pay FINANCE CHARGES related to any questioned amount. If we didn't make a mistake, you may have to pay FINANCE CHARGES, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay us the amount that we think you owe, we may report you as delinquent. However, if your explanation does not satisfy us and you write to us within ten (10) days telling us that you still refuse to pay, we will tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone that we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we can't collect the first $50 of the questioned amount, even if your bill is correct.

RUSSELL D HOLTZ/995071641701240
BANK OF AMERICA EQUITY MAXIMIZER AGREEMENT AND DISCLOSURE STATEMENT
USHEAG.BOA  09/12/05  005 DOCMAGIC, INC.                    Page 10 of 10

DocMagic ℰℱℴʳᵐˢ 800-649-1362
www.docmagic.com

## NOTICE OF RIGHT TO CANCEL

Loan Number: 68249017102999

Required Signer(s):  RUSSELL D HOLTZ

Property Address:  905 SUITER ST, HOLLISTER, CALIFORNIA 95023-4631

### YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1.  the date of the transaction, which is  JUNE 14, 2007          ; or
2.  the date you receive your Truth in Lending disclosures; or
3.  the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to  the address below. If we do not take possession of the money or property within 20 calendar days of your offer,  you may keep it without further obligation.

---

### HOW TO CANCEL

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Bank of America, NA
P.O. BOX 5080
Hartford, CT 06102-5080

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of  JUNE 18, 2007
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL.

_____          _____
Consumer's Signature                                                          Date
RUSSELL D HOLTZ

---

### ACKNOWLEDGMENT OF RECEIPT

THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

_____          6/14/07
RUSSELL D HOLTZ                                                         Date

RUSSELL D HOLTZ/99507164170124D
NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
NORTC.BOA  04/11/07

DocMagic &copy; 2005  800-649-1362
www.docmagic.com

JS 44 (Rev. 12/07) (cand rev 1-16-08) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

**I. (a) PLAINTIFFS**

RUSSELL DON HOLTZ

**DEFENDANTS**

BANK OF AMERICA, NATIONAL ASSOCIATION, et al.

**(b)** County of Residence of First Listed Plaintiff SAN BENITO
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Consumer Law Center, Inc.
12 South First Street, Suite 1014
San Jose, CA 95113-2418
(408) 294-6100

Attorneys (If Known)

E-FILING

C08 02166 RS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. § 1601 et seq.

Brief description of cause:
Predatory and Abusive Lending, Violations of the Truth in Lending Act, and the Real Estate and Settlement Procedures Act

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)**
(PLACE AND "X" IN ONE BOX ONLY)
☐ SAN FRANCISCO/OAKLAND ☒ SAN JOSE

DATE 4-25-08

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.    (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example:        U.S. Civil Statute: 47 USC 553
                                                   Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.
**Date and Attorney Signature.** Date and sign the civil cover sheet.